# PIONEER TELEPHONE & TELEGRAPH CO. v. WESTEN-HAVER *et al.*

No. 503.    Opinion Filed January 10, 1911. ·

Rehearing Denied September 12, 1911.

(118 Pac. 354.)

1.  **TELEGRAPHS AND TELEPHONES—Rates—Reasonableness—Value of Plant—Interest on Capital During Construction.** When the present value of a telephone exchange plant is being ascertained for the purpose of determining what amount the company is entitled to earn as a fair return upon its investment, and such value is ascertained by determining what amount it would cost to reproduce the plant, a reasonable amount for interest on the capital invested in the properties of the plant during period of construction should be allowed.

2.  **SAME—Value of Plant—Deduction for Depreciation.** In determining the present value of a telephone exchange. plant for the purpose of testing the reasonableness of rates fixed by order of the Corporation Commission by estimating the cost of reproducing the plant, a deduction for depreciation of the physical properties from age and use should be made from the estimated cost of reproduction, or replacement new.

3.  **SAME—Going-Concern Value.** In ascertaining the present value of said plant for the purpose of fixing rates that·shall be charged for services thereon, the Corporation Commission should not con-·fine its consideration to their valuation of the bare physical plant, where such exchange has a large patronage sufficient to pay operating expenses, fixed charges, and some profits, when such patronage has been built up by expenditure of labor and money for a period of time during which the plant was operated at a loss, but these facts should be considered, and a reasonable amount allowed for its earning capacity as a going concern.

4.  **CORPORATION COMMISSION—Findings of Fact—Conclusiveness.** Findings of fact by the Corporation Commission, based upon any competent evidence supporting same, are presumed prima facie to be correct; but, when any finding is not supported by any evidence, and there is strong evidence to the contrary, this .presumption does not prevail.

5.  **TELEGRAPHS AND TELEPHONES—Rates—Allowance for Depreciation of Plant.** A sufficient amount should be allowed from the earnings of a telephone exchange to make good the depreciation of the plant and replace the deteriorated portions thereof, when they become so impaired that they can no longer be made useful by repair.

6.  **TELEGRAPHS AND TELEPHONES—Rates—Reasonableness—Case.** Rates charged by a telephone company for services of a

telephone exchange that yield only sufficient revenue to pay operating expenses and fixed charges, including a reasonable amount for depreciation and a return of approximately 5.5 per cent. per annum (less than the legal rate of interest) on the value of the properties used in rendering the service, held not excessive, oppressive, or unreasonable to the public.

(Syllabus by the Court.)

*Appeal from the State Corporation Commission.*

Action by E. H. Westenhaver and others and the State of Oklahoma against the Pioneer Telephone & Telegraph Company. Judgment for plaintiffs, and defendant appeals. Reversed.

See, also, 23 Okla. 226, 99 Pac. 1019.

*Edward P. Meany, S. H. Harris, Hunt Chipley, Jno. L. Swaze,* and *Henry E. Asp,* for appellant.

*G. A. Henshaw,* Asst. Atty. Gen., for appellees.

HAYES, J.   Appellant is a public service corporation engaged in the telephone business in this state.   It maintains at various points in the state telephone exchanges, and between many of the towns and cities of the state a long-distance or toll telephone service.   It owns and operates at the city of Enid a local telephone exchange and toll lines from that city to other points in the state.   At the time this proceeding was begun before the Corporation Commission, appellant was charging for service upon its local exchange at that place the following schedule of rates per month:   $3 per month for business telephones; $2 for residence telephones; and $1.50 per month for party-line telephones.   This schedule of rates had been enforced by appellants only since December 1, 1907.   Prior to that date, the following schedule of rates per month were charged by appellant, to wit:   $2 for business wall telephones; $2.50 for desk telephones; $1.50 for residence individual telephones; $1.25 for residence two party-line telephones; and $1 for residence four party-line telephones.   On February 4, 1908, appellees filed with the Corporation Commission their petition, complaining that appel-

lant had arbitrarily and unreasonably raised the rate of charges for its exchange service, and prayed for an order of the Corporation Commission prohibiting appellant from charging and collecting under the new schedule of rates, and to require it to restore the rates charged by it and prevailing before December 1, 1907. After answer was filed by appellant, several hearings were had before the Commission, at which a great volume of testimony was introduced. On May 12, 1908, the Commission made an order requiring that the rates to be charged by appellant should be practically the same as the rates charged before December 1, 1907, and before the schedule of rates complained of was promulgated and put in force by appellant. From this order, appellant appealed. The case was then briefed by both parties and argued orally in this court. At the original hearing before the Commission, and upon entry of the order appealed from, no finding of facts was made by the Commission and certified to this court, as required by section 22, art. 9, Const. On February 9, 1909, the cause was remanded to the Commission, with instructions to make such investigations of the evidence then in the record, or that might thereafter be tendered before the Commission by any party in interest, as might be necessary to a finding of facts, and to find the facts upon the following questions: First, the value of the property employed by appellant in its exchange at Enid; second, the expense of operating such exchange; third, the amount of expenditures required to keep it in repair; fourth, the depreciation of its property, if any; and, fifth, the income, or the probable income, which appellant will receive from the rates fixed by the Commission. *Pioneer Telephone & Telegraph Co. v. Westenhaver et al.*, 23 Okla. 226, 99 Pac. 1019. On June 7, 1909, a rehearing was had before the Commission, at which much additional testimony was introduced on behalf of both appellant and appellees. On March 8, 1910, approximately nine months after the rehearing, the Commission made findings of fact and certified the same, together with the evidence taken

at the rehearing, to this court, and the cause is now before us for disposition upon its merits.

The power conferred and the duties imposed by the Constitution upon this court in appeals from orders of the Corporation Commission affecting rates and charges for service are dual in their nature. The court must first investigate the order, to ascertain whether it is reasonable and just to the parties it affects, and it must, secondly, if it be found that the order is unreasonable and unjust, substitute therefor such order as in the court's opinion should have been made by the Commission at the time of entering the order appealed from. Sections 22, 23, art. 9, Const. The first of these duties is judicial in its nature; the second one is of legislative character. The order appealed from prescribes a rate for business telephones that is $1 per month lower than the present rate charged. The rate prescribed for residence phones is 50 cents per month lower than the present rate. In the finding of facts certified to the court, the Commission suggests that the rate on business telephones should be reduced 63 cents per station per month, and that residence telephones should be reduced 35 cents per station per month. No suggestion is made as to any other rates prescribed by the order. From this suggestion, we understand the Commission to be of the opinion, in the light of the additional evidence taken at the rehearing, and under its findings of the facts, that some of the rates prescribed by the order are too low. Such is the reasonable, if not inevitable, inference to be drawn from the suggestion that some of the rates should be higher than those fixed in the order appealed from. We think this suggestion is a confession of error, and it seems to have been so treated by counsel for appellees. If it was not the duty of this court to make an order, such as should have been made by the Commission, this cause, under the suggestions of the Commission, could and should be reversed and remanded. To substitute for the order appealed from, however, such order as the Commission should have made, requires an investigation of the facts and a consideration of those

principles of law that are involved in all rate regulation of public service corporations.

At the threshold of this investigation, we are met with the contention of counsel for appellant that some of the findings of fact are not supported by the evidence, and that others are based upon erroneous conclusions of the law. The basis of all calculations as to the reasonableness of the rates to be charged by public service corporations is the fair value of the property used by the corporation in rendering the service to the public. The rule generally established by the courts, including the Supreme Court of the United States, for determining the validity of legislative acts, or of orders of boards or commissions, prescribing rates, is that the act is valid, unless the rates be unreasonable to the extent that their enforcement would be equivalent to the taking of property for public use without such compensation as, under the circumstances, is just to the owner and to the public. The rate is fair when its application will yield a fair return upon the reasonable value of the property at the time it is being used for the public. It is unfair when it does not yield such return. *Knoxville v. Knoxville Water Co.,* 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371; *San Diego Land & Town Co. v. Jasper,* 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892; *San Diego Land & Town Co. v. National City,* 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; *Smyth v. Ames,* 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. No inflexible method for the ascertainment of the value of the property used in the service has been fixed by legislative bodies dealing with rates, or by the courts in determining the validity of rates, and from the nature of the subject no inflexible method can be fixed. Sometimes the present value is arrived at by ascertaining the original cost of construction and all betterments, and deducting therefrom for depreciation; but this method does not always prove to be fair and just. If there was extravagance and unnecessary waste in the construction, or, as is often the case, fictitious stocks and bonds issued, the proceeds

of which did not go into the original construction, such method would prove unfair to the public. On the other hand, where the market price of the physical units or of the labor entering into the construction of the plant has advanced since its construction, the original cost may be much lower than the present value, and for that reason be to the owner of the plant an unfair determination of its present value. The method most frequently used is to ascertain what it will cost to reproduce the plant, or the cost of its replacement at the present time, and deduct therefrom for depreciation in the existing plant. Both methods may be used and considered in ascertaining the present value, and both are often resorted to, as was done in this case.

By appellant's evidence, it is established that appellant has not owned the exchange plant at Enid from its construction, but that it acquired the plant, in 1905, from others, and paid therefor the sum of $54,000, which was the amount the plant had cost those who had constructed it. Appellant, immediately after purchasing the plant, began reconstructing it and enlarging its equipment. It expended for these purposes, during the year 1905, the sum of $17,115.78; during the year 1906, $52,177.47; during the year 1907, $12,395.76. None of said expenditures was made for land, buildings, rights of way, franchises, or other privileges. The total cost of the plant to appellant at the time of the first hearing in February, 1908, exclusive of lands and buildings, was $135,689.01. The Commission undertook to ascertain the present value by finding the reproductive value new, or cost of replacement. This method is practicable for a telephone exchange plant, and is probably as fair and accurate a method as could have been adopted in the present case. In pursuance of this method, a Mr. Player, telephone expert for the Commission, was sent with assistants to Enid to take inventory of the plant, and appraise its reproductive value, or cost of replacement. The summary of his appraisement, corrected in accordance with admissions at the trial, is as follows:

| | | |
|---|---|---:|
| 1. | Interior equipment local exchange | $20,503.39 |
| 2. | Subscribers' stations | 19,984.53 |
| 3. | Aerial construction | 29,634.50 |
| 4. | Underground construction | 11,371.22 |

| | | |
|---|---|---:|
| 5. | Replacement cost of the physical property after adding the cost of jumper wires and transmitters and receivers | $18,493.64 |
| 6. | Engineering and supervision, 10 per cent. | 8,149.37 |

| | | |
|---|---|---:|
| 7. | Total replacement cost of physical property on a contract basis | $89,643.01 |
| 8. | Office fixtures and furniture | 1,473.75 |
| 9. | Stock on hand—material | 2,433.56 |
| 10. | Stock on hand—tools | 153.37 |
| 11. | Rolling stock and live stock | 960.00 |

$94,663.69

The Commission adopted and found the foregoing appraisement to be the present value of the plant, and that the amount upon which appellant is entitled to receive a fair return is $94,663.69. Appellant accepts in this proceeding all the items in the foregoing appraisement as correct, but contends that there are certain elements entering into the reproductive value that the Commission has refused to allow. The items for which it contends, but which were refused by the Commission, are as follows:

| | | |
|---|---|---:|
| 1. | Miscellaneous | $ 2,050.23 |
| 2. | Piecemeal construction and working around plant | 6,000.00 |
| 3. | Interest during construction | 4,000.00 |
| 4. | Working capital | 8,740.06 |

$20,799.34

Item No. 1, it is contended, should be allowed to cover unforeseen emergencies and contingencies which always add to the cost of construction, but are not visible in the completed struc-

ture, such as loss, breakage, or destruction of material and emergencies requiring extra labor. It may be that replacement costs in some cases cannot be correctly ascertained without a separate allowance of the character here contended for; the amount of such allowance to be determined by the character of the plant, of the physical units of which it is composed, the character of labor required to construct it, and the experience of others in constructing similar plants; but the evidence in behalf of appellant that any amount should be allowed in this case is very meager. There is a statement of one of its witnesses that the arbitrary sum of 5 per cent. of the reproductive value of the physical units in the complete plant should be allowed for this purpose. We do not think this contention sufficiently supported by the record to require the holding of the Commission on this item to be disturbed. It is true that Mr. Player, at one point in his testimony, testifies that his appraisal does not allow for any miscellaneous and incidental expenses; but he further testifies, on redirect examination, as follows:

"Q. Well, on this plant, could it be reproduced for $90,000 by contract? A. As a whole, just as it stands, without interest on the money during the construction, it could be, in my opinion. Q. Interest on money during construction is a different proposition; we are not discussing that. What I want to know is what that plant could be built for by contract, or could be built for by you going out there and building it, and counting the labor on either proposition? A. Just the actual material and labor on the plant, you mean? Q. Yes; necessary for a man like you to go out there and build that plant. A. I could do it for that amount. Q. For what amount? A. For about $90,000."

Then on cross-examination, he said:

"Q. That would be, would it not, exclusive of real estate? A. Yes, sir. Q. And buildings? A. I am just speaking of the physical properties. Q. Just the mere naked physical properties as shown by these figures, not including those other items we went over before? A. Yes, sir. Q. And assuming you had a clear field to build in? A. Yes, sir."

The estimates of Mr. Player have generally been adopted by all the parties to this proceeding, and we are not disposed to

reject his estimate of the cost of reconstruction, exclusive of the expense of piecemeal construction and working around the old plant, and interest on investment during construction. These last items constitute items Nos. 2 and 3, contended for by appellant, but disallowed by the Commission. Referring to them, Mr. Player specifically states that they are not included in the aggregate of his appraisement, or his estimate of the cost of reconstruction; but, when he excepts them, he does not except the expense constituting item No. 1.

The evidence upon which the appellant insists item No. 2, refused by the Commission, should have been allowed is substantially as follows, quoting from one of witnesses:

"The necessity of concentrating the large number of wires required of the larger city of Enid makes it advisable to adopt a different distribution or arrangement of pole lines. This involved the moving of some of the old poles in the lines, in order to shorten up spans to get sufficient strength for carrying the larger cables. The moving of the poles is an expensive undertaking, as same must be moved without crossing up or interfering with the wires then being used in the old plant. In a great many instances, new leads crossed old leads in such a way that extra work had to be done to prevent the new work from interfering with the operation of the old plant. The subscribers' instruments had to be rewired and adapted to work temporarily on the new plant until final changes should be made. In fact there was no part of the new work that did not have to be worked out with some special regard to the protection of the old plant, in order that service might be continued."

We think, however, that the Commission committed no error in refusing to allow this item. The fact that appellant's plant has been constructed piecemeal does not increase its present value, although the cost of construction by such method may have been greater than if it had been constructed at one time. The plant, in our opinion, in arriving at its cost of reproduction new, should not be considered as an existing obstruction upon the streets, which would have to be worked around in constructing a new plant of a similar kind. The fact that other obstructions, such as telegraph systems or other telephone plants, exist in the streets

at the present time, and would have to be worked around at this time in building a plant like appellant's, might require an allowance in arriving at the cost of reproduction new of appellant's plant; but a determination of that question is not required here, for it is not for such obstruction that this item is claimed.

Item No. 3, disallowed by the Commission, is for interest on the capital invested during the period of construction. There is no controversy about the amount of this claim. The Commission refused to allow it, because it did not consider it a proper element of reproductive value. Counsel for the Commission, however, at the oral argument before this court, conceded, and we think properly, that there was no ground for refusing its allowance. It is a matter within the observation and knowledge of all that a plant, the cost of whose physical units put together into a completed plant approximates $100,000, cannot be constructed instantly. It requires time to assemble the physical properties, and still a greater length of time to put those units into place, where they may be used to render service. During this period, the capital invested must of necessity be idle, and no income can be derived therefrom. When the construction of the plant is completed, no willing seller, who is not forced to sell, would take for his plant the cost of the physical units and the cost of the labor in the construction, because the plant has cost him in addition thereto the use of the capital, or a certain part thereof, invested in the physical properties during the time of construction. A willing buyer could afford to pay, and would pay, more than the actual cost of labor and material, assuming that the plant has been economically constructed, because such cost would not represent the total expenditures the purchaser would have to make, in order to construct the plant himself. In addition to such expenditures, he would have to expend the earnings of his capital during the period of construction. No case has been cited, and in our investigation we have found no case, involving this question, where a reasonable amount has not been considered and allowed for loss of interest during construction as part of the cost of construction.

In addition to the foregoing items disallowed by the Commission, and the items allowed as constituting the fixed capital of the company, appellant contends for an allowance of item No. 4, as working capital, on which, also, it is entitled to receive a fair return. The Commission allowed the sum of $2,433.56 for stock on hand at Enid. Item No. 9 of Mr. Player's appraisal shows that sum to be the amount of stock and supplies on hand at Enid at the time he appraised the plant. Appellant maintains a general office at Oklahoma City, where are kept tools and teams, stock on hand in the general storehouse, a repair shop, cash to meet the current expenses of its plants and system throughout the state, and general office fixtures that are used by the general officers of the company, whose time is devoted to the entire properties of the company. In explanation of this item one of the witnesses for appellant testified as follows:

"From the fact that there is a very small stock carried at Enid in excess of what is actually in service, the general stock is carried at Oklahoma City; and in case the Enid exchange would need some material it would be shipped out of Oklahoma City, in many cases, to save time, and for the further reason that the stock at Oklahoma City is bought in large quantities, and thus at a lower price; and also in case some of the apparatus, telephones, or central office equipment should get out of repair it would be sent to Oklahoma City to the general repair shop to be repaired, and returned to Enid. This saves the necessity of keeping a shop force and a much larger stock at the Enid exchange, and we believe it to be an economic saving to the Enid exchange. The proportion of the cash is what might be termed the proportionate amount chargeable to Enid of the working cash capital of the company."

The foregoing evidence is corroborated by evidence from other witnesses. There is nothing in the record contradicting this evidence, except the finding of the Commission. If supplies for repairs in the Enid plant can be procured cheaper by concentrating the supplies of appellant's entire system into a general store at a central point, to be shipped out as needed at the plant, and can be furnished to the plant at Enid by such method at less cost, after allowing return on its share of the investment

in such general store, than by purchasing such supplies direct from general dealer and shipping them direct to Enid, and if it is cheaper to have repair work for the plant done at the general shop of the company than to maintain a shop for such purposes at Enid, or to have such work done at shops not belonging to the company, the system adopted by appellant is better, both for it and the public, for whatever lowers the cost of the service it gives to the public must ultimately lower the charges to the public therefor; for one of the primary elements to be considered in weighing the reasonableness of any charge for service is, What does it cost to render the service? Discussing the question of working capital, the Railroad Commission of Wisconsin, in *Cunningham et al. v. Chippewa Falls Water & Light Co.,* 5 W. R. C. R. 302, said:

"Plants of this kind, the same as practically all other business enterprises, must have on hand a reasonable cash balance and other current resources, in order to operate economically and effectively. That this is the case, is most self-evident. It has been pointed out in other decisions of this Commission, in *Hill et al. v. Antigo Water Co.,* 3 W. R. C. R. 623, 631, and particularly in *State Journal et al. v. Madison Gas & Electric Co.,* 4 W. R. C. R. 501, 550. Just what sum represents a fair amount for working capital is nearly always a matter of judgment, and to this there is no exception in this case."

The testimony in the record as to what would be a fair amount for working capital in this case comes from the witnesses of appellant, who are its officers and employees. At the first hearing before the Commission, one of the company's officers took an average of the company's account for supplies at the general store, money invested in tools, repair shop, supplies, general office furniture and fixtures, and cash on hand used in paying operating expenses during the ten months preceding the hearing, and apportioned to the Enid plant an amount that bore the same ratio to the appellant's total working capital that the value of its plant at Enid bears to the value of the entire properties of appellant, which shows that $7,249.24 is the amount of the working capital of appellant that should be charged to the

Enid plant. As stated by the Wisconsin Commission, what amount shall be allowed as working capital in any case is largely a matter of judgment. The Commission has refused in this case to allow any working capital, except for the supplies then on hand at Enid. That some cash on hand is required to operate so large a plant economically and to the best interests of both the company and the public is plain. There is no evidence in the record impeaching the fairness, reasonableness, or necessity of the foregoing estimated amount for working capital based upon the experience of the company. At the rehearing, appellant introduced estimates for a larger working capital than asked for at the first hearing. Whatever may have been the changes in the conditions of the other plants of appellant between the hearing and the rehearing, there is nothing in the evidence to show any change in the plant at Enid requiring additional working capital to that which, for a period of ten months before the first hearing, had proven sufficient, and we think the amount established at the first hearing, to wit, $7,249.24, is sufficient. The Commission committed error in refusing to allow anything on items Nos. 3 and 4, disallowed, and should have allowed $4,000 on item No. 3, and $7,249.24 on item No. 4, or a total of $11,249.24. While the Commission, in disallowing these items in arriving at the present value of appellant's plant, committed error prejudicial to appellant, such error, we think, is offset by an omission of the Commission which operates against appellees and the public.

In finding the present value of the physical properties of the plant, the Commission treats the reproductive value of such properties new as the present value. But the physical properties of this plant are not new. Some parts of the same have been used for several years. It is true that a large portion of the same had been used only for periods of one and two years at the time of the hearing, but, as established by appellant's evidence, which we shall consider later, every year there is a depreciation in the physical properties of the plant that is not, and cannot be, taken care of by current repair, and, although some

of the physical units have been used only for a brief time, such use brings about a depreciation; and the reproductive value new of such physical units represents the present value only when there is deducted therefrom the amount of annual depreciation. *Knoxville v. Knoxville Water Co.*, 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371. When appellant acquired the plant at Enid, in 1905, for the sum of $54,000, it computed the value of the physical property of the plant to be $32,276.75, and charged that amount on its books to construction. During the year 1905, $17,115.78 was expended in reconstructing and extending the plant. At the beginning of 1906, appellant had $49,392.53 invested in the physical properties of its plant. During the year 1906, $52,176.42 was expended in reconstructing and extensions, making a total of $101,519.95 invested in the physical properties of the plant on the 1st day of January, 1907. During 1907, $12,395.76 was expended in reconstruction and extension, making a total of $113,815.71 in the physical properties on January 1, 1908. These amounts are all based upon the evidence of appellant's witnesses; but, since the cost of reproduction new adopted by the Commission and by all the parties to this proceeding, is approximately 17 per cent. lower than the estimated cost of reconstruction as shown by the evidence of appellant's witnesses, for the purpose we are now considering the amounts invested in the physical properties during these years, the foregoing estimates should be reduced 17 per cent. When this is done, we find the following amounts to represent the value of the physical properties at the beginning of each of said years:

1906_____ $40,995.20.
1907_____ $84,261.56.
1908_____ $94,663.69.

All the evidence is to the effect that there is an annual depreciation of the properties of a telephone plant of the character of appellant's plant at Enid in the approximate amount of 7 per cent. per year over what can be taken care of by current repairs. Seven per cent. of the construction value of this plant for the years 1906, 1907, and 1908 makes a total depreciation in

the sum of $15,410.46. During the year 1908, $1,340.60 was expended in replacing those parts of the plant so depreciated that they could no longer be made serviceable by repair. This amount should be deducted from the total depreciation, which would leave a net depreciation of $14,069.86. This amount of depreciation for those three years, based on the estimate of 7 per cent. annual depreciation which the Commission failed to consider in determining the reproductive and present value of the plant, exceeds the amount of said items Nos. 3 and 4, which it refused to allow in finding such value. Owing to the fact that this plant is in large part new, the depreciation for the said three years would probably not reach the annual average. There is no evidence, however, as to what the ratio of depreciation of these three years would be to the average; but, since approximately one-third in value of the physical properties of the plant consists of old property existing in the plant at the time of purchase by appellant, there would be considerable depreciation during each of said years; and, from all the facts in the case, we think it cannot be said that the amount erroneously disallowed by the Commission is greater than the element of depreciation which the Commission failed to consider. It does not clearly appear that the finding of the Commission that $94,663.69, exclusive of going-concern value, is the present value of the plant upon which appellant is entitled to receive a fair return is so erroneous that it should be disturbed, and, exclusive of the element of going-concern value, we adopt said sum as the total value of appellant's property on which it is entitled to a fair return.

There is no contention that any value on account of unexpired franchise or for good will should be added to the reproductive value, in order to ascertain the present value; but it is contended that, by reason of the fact that appellant's plant has an established system of operation, has at present customers sufficient in number to pay the operating expenses and annual depreciation and some profit, it has a value beyond the mere cost of reproducing the plant. This element of value contended for

has been generally referred to by the authorities as "the going-concern value" or "going value." No case from the Supreme Court of the United States involving the reasonableness of rates or charges, wherein this question has been considered by that court, has been called to our attention. In *Knoxville v. Knoxville Water Co., supra,* the lower court added to the appraisement of the physical properties the sum of $6,000,000 for going-concern value. The Supreme Court assumed, without deciding, that this item was properly added. There are many cases wherein the fair market value of public service property was involved, under franchises reserving to the municipality the right to purchase, the plant at or after a stipulated time for the fair market value thereof. These cases, so far as we have been able to examine them, uniformly hold that, in the absence of a provision in the franchise to the contrary, the going-concern element of value must be considered in ascertaining the fair value of the plant.

One of the leading cases so holding is the *National Water Works Co. v. Kansas City,* 62 Fed. 853, 10 C. C. A. 653, 27 L. R. A. 827. In that case it was said in the opinion by Mr. Justice Brewer:

"Nor would the mere cost of reproducing the waterworks plant be a fair test, because that does not take into account the value which flows from the established connections between the pipes and the buildings of the city. It is obvious that the mere cost of purchasing the land, constructing the buildings, putting in the machinery, and laying the pipes in the streets—in other words, the cost of reproduction—does not give the value of the property as it is to-day. A completed system of waterworks, such as the company has, without a single connection between the pipes in the streets and the buildings of the city, would be a property of much less value than that system connected, as it is, with so many buildings, and earning, in consequence thereof, the money which it does earn. The fact that it is a system in operation, not only with a capacity to supply the city, but actually supplying many buildings in the city, not only with a capacity to earn, but actually earning, makes it true that 'the fair and equitable value' is something in excess of the cost of reproduction. * * * The city, by this purchase, steps into

possession of a waterworks plant, not merely a completed system for bringing water to the city, and distributing it through pipes placed in the streets, but a system already earning a large income by virtue of having secured connections between the pipes in the streets, and a multitude of private buildings. It steps into possession of a property which not only has the ability to earn, but is in fact earning. It should pay therefor, not merely the value of a system which might be made to earn, but that of a system which does earn."

Other similar cases supporting this doctrine, some of which cite the foregoing cases, are: *City of Omaha v. Omaha Water Co.*, 218 U. S. 180, 30 Sup. Ct. 615, 54 L. Ed. 991; *Spring Valley Water Works v. City of San Francisco* (C. C.) 124 Fed. 574; *Gloucester Water Supply Co. v. City of Gloucester*, 179 Mass. 365, 60 N. E. 977; *Kennebec Water Dist. v. City of Waterville*, 97 Me. 185, 54 Atl. 6, 60 L. R. A. 856; *Newburyport Water Co. v. City of Newburyport*, 168 Mass. 541, 47 N. E. 533; *Brunswick & T. Water Dist. v. Maine Water Co.*, 99 Me. 371, 59 Atl. 537.

In the last-cited case it is said:

"Nevertheless it has value as a structure. But, more than this, it is a structure in actual use; a use remunerative to some extent. It has customers. It is actually engaged in business. It is a going concern. The value of the structure is enhanced by the fact that it is being used in, and in fact is essential to, a going-concern business. We speak sometimes of a going-concern value as if it is or could be separate and distinct from structure value—so much for structure, and so much for going concern. But this is not an accurate statement. The going-concern part of it has no existence, except as a characteristic of the structure. If no structure, no going concern. If a structure in use, it is a structure whose value is affected by the fact that it is in use. There is only one value. It is the value of the structure as being used. That is all there is of it. * * * The district obtains and the company yields its plant, its structure; but it is the structure as being used, with the rights to use it as stated; no less, no more. We apprehend that some difficulty in discussion has arisen for attempting to differentiate in logic what is inseparable in fact. The property taken is a single thing, to which belong certain characteristics which affect its

value. The thing cannot be taken without these characteristics. If it is attempted to value the thing separate from its inherent characteristics, elements which add value to the thing are omitted. If these elements are omitted, the owner fails to receive the full and fair value of the thing, and thereby is denied just compensation."

For the purpose of taxation, it is well established that this element of value must be included in assessing the property. *Galveston, Harrisburg & San Antonio Ry. Co. v. State of Texas,* 210 U. S. 217, 28 Sup. Ct. 638, 52 L. Ed. 1031; *State ex rel. Foster v. Williams,* 123 Wis. 73, 100 N. W. 1052; *Chicago & N. W. R. v. State,* 128 Wis. 553, 108 N. W. 557.

Whether, however, all matters which are considered in the foregoing two classes of cases as part of the going value, for the purposes involved in those cases, should be considered in determining the value as a basis for rate making is not necessary to determine in this case. It is apparent, however, that a complete telephone plant, without a single subscriber, or with but few subscribers, is less valuable, both to the owner of the plant and to the members of the public it serves, than the same plant with a larger patronage. The more people a subscriber can communicate with over a telephone exchange, the more service, as a general rule, is such exchange to him; and it is only when such exchange has subscribers that the property of the owner invested therein has an earning power. But subscribers are not obtained without expenditure of money, labor, and time, during which the capital invested in the plant earns nothing, and often fails to pay operating expenses. The customers must be connected with the system of the plant; trained employees must be obtained; and a system of operation must be established. Few industries, if any, involving an investment of $90,000 or more, can be made self-sustaining from the first day of their operation. The uncontradicted evidence in this case discloses that appellant's plant, for the years preceding the first hearing, failed to produce revenue sufficient for operating expenses, current repair, and lay aside an amount for depreciation. During the time of development, there is a loss of money actually expended and of dividends upon

the property invested. How shall this be taken care of? Must it be borne by the owner of the plant? Or by the initial customers? Or shall it be treated as part of the investment or value of the plant, constituting the basis upon which charges shall be made to all customers who receive the benefits from the increased service-rendering power of the plant by reason of these expenditures? It seems that the last solution is the logical, just, and correct one. If rates were to be charged from the beginning, so as to cover these expenditures, and earn a dividend from the time a plant is first operated, the rate to the first customers would be in many instances, if not in all, so exorbitant as to be prohibitive, and would be so at the time when the plant could be of least service to them. On the other hand, the public cannot expect as a business proposition, or demand as a legal right, that this loss shall be borne by him who furnishes the service; for investors in public service property make such investments for the return they will yield; and, if the law required that a portion of the investments shall never yield any return, but shall be a total loss to the investor, capital would unwillingly be placed into such class of investments; but the law, in our opinion, does not so require. Private property can no more be taken in this method for public use without compensation than by any other method. When the use of the property and the expenditures made during the nonexpense-paying and nondividend-paying period of the plant are treated as an element of the value of the property upon which fair returns shall be allowed, then the burden is distributed among those who receive the benefits of the expenditures and the use of the property in its enhanced value.

Discussing this question, the Railroad Commission of Wisconsin, in *Geo. W. Hill et al. v. Antigo Water Co.,* decided August 3, 1909, said:

"With respect to the value of the plant, it was found that for the purposes of this case, and under the conditions that prevail, the investors in the plant and those who carry on its business are equitably entitled to reasonable returns for interest and profits on a valuation that fairly represents the legitimate and necessary costs of constructing the plant and of building up its

business. The valuation which is thus made the basis for the earning of the rates should also be a valuation that is subject to the fewest fluctuations. Such a valuation as this appears to be equitable to the investors and those who carry on the business, on the one hand, and to the customers of the plant, on the other. It also furnishes a basis upon which rates may be fixed that are reasonable and just to all concerned, and that also have such stability as is required by the best interests of those affected."

Although that body is not one of last resort for the determination of questions involving the reasonableness of rates, the reasoning with which it supports the doctrine above quoted commends its conclusions to us as being sound. All the evidence of appellant is that the going-concern value of the plant in this case is equivalent to 20 per cent. of the reproductive value. This evidence is not contradicted by the state; the position of counsel for the state and of the Commission being that, whatever its amount is, it is not an element of present value forming a basis for the earning of rates. Twenty per cent. of the reproductive value is $18,932.73, which, added to the reproductive value of the physical properties found by the Commission, makes a total present value, on which appellant is entitled to receive a fair return, in the sum of $113,596.42.

No complaint is made of the findings of the Commission as to some of the items of cost and expense of operating the exchange. We shall consider separately only those items as to which appellant complains.

The evidence of all witnesses, both in behalf of appellant and in behalf of appellees, is that the operating expenses of the exchange for the year 1908 was $16,239.22. In this item of expense are included the salaries and wages of the manager, chief operator, and all other employees employed at Enid, rent, light, heat, laundry, ice, stationery, and advertising. These items were carried upon the books of the appellant, for the year 1908, in operating expense account. At the first hearing, there was evidence that the same account for the year 1907 was $12,243.59; but during that year several of the items charged to this account

during the year 1908 were charged to the general expense account. There were more stations in the exchange in the year 1908 than during the year 1907; and, when the total expense for each of these years is considered, it is disclosed by the record that the operating expense per station is practically the same. The Commission in its findings makes two estimates for the annual operating expenses. By one estimate the amount thereof is fixed at $11,880, and by the other estimate at $13,500; but no evidence or facts certified up to this court in the record is pointed out in the findings of fact to support these estimates, and we have been unable to find any that do so. On the other hand, the expert accountant of the Commission, who examined the books and accounts of appellant at the instance of the Commission, testifies to the correctness of the operating expense account for the year 1908, and no effort is made in any way to impeach the account, or to show that needless expenditures were made. With no evidence in the record supporting the estimate of the Commission upon this item, and with all the evidence, some of which is from the state's witnesses, supporting the contention of the appellant, this finding of the Commission cannot stand. Findings of fact made by the Commission upon competent evidence from witnesses is *prima facie* presumed to be correct, but this presumption does not follow when there is no evidence supporting the findings, and there is strong evidence to the contrary. *Atchison, Topeka & Santa Fe Ry. Co. v. State et al.*, 23 Okla. 510, 101 Pac. 262; *Chicago, Rock Island & Pac. Ry. Co. et al. v. State et al.*, 24 Okla. 370, 103 Pac. 617, 24 L. R. A. (N. S.) 393.

The next finding complained of relates to general expense. Appellant carries upon its books a general expense account, to which is charged the salaries of the general officers of the company and of the employees of the various departments of the general office, including a general engineer, experts, legal service, and other items of expense expended for services rendered to the entire system of the appellant. The amount of this expense apportioned to the Enid exchange is determined by a proportion based upon the operating expenses of the Enid exchange

and the entire operating expenses of all the exchanges of the company. Several telephone experts, who testified on behalf of the company, state that the amount properly chargeable to any exchange can be ascertained only by adopting some arbitrary basis for the entire system; and that the basis adopted by appellant is the most fair, equitable, and accurate basis that can be adopted. Under this basis, the amount of general expense properly chargeable to the Enid plant for the year 1907 is $3,330.49, and for the year 1908, $3,175.31; and appellant contends that it should be allowed to charge rates sufficient to create annually this last sum, with which to pay this annual general expense. It has not been questioned that this expense should not be distributed among the exchanges and the toll business upon some fair basis; nor has any question been made that any of the items charged to this account were not rightfully so charged; nor that they did not represent expenditures made for the best interests of the company and the public; nor that they were not economically made. The Commission makes an estimate of this expense properly chargeable to the Enid exchange by first dividing the entire general expense of the company between appellant's toll business and its entire exchange system, upon the same ratio that the incomes from the toll business and from the entire exchange system bear to each other. Then the Commission ascertains the expense per station, and, by multiplying this amount by the number of stations in the plant at Enid, it arrives at an apportionment of this expense to the plant at Enid. This method of apportionment of general expense shows $2,943 properly chargeable to the Enid plant. For the purpose of this case, this amount is practically the same as the amount arrived at upon the basis adopted by the appellant. The Commission, however, adopts neither of said amounts, but finds thereon in the following language:

"The general expense properly chargeable to Enid, considering the local force that is maintained there, should, in our judgment, not exceed over $2,000 per annum."

This finding is not supported by the evidence; and if the

Commission is in possession of facts upon which to base it they have not been certified to us. Upon this no evidence on behalf of the state or appellees was introduced. Why the expert witnesses for the state were not called to testify as to the most reasonable, practical, and accurate method of apportioning this expense does not appear. It is reasonable to presume, under the circumstances, that if they had testified their evidence would support the contention of the appellant. Had the Commission adopted any basis for apportioning this legitimate expense that appeared reasonable and fairly accurate, this court would not be disposed to disturb the finding arrived at thereby, for the finding upon this question, in a large measure, involves matters of judgment; but the Commission abandoned the only basis of apportionment suggested by it, and, so far as this record discloses, arbitrarily found the sum of $2,000. The amount contended for by appellant is slightly less than the amount apportioned to this plant for the year 1907, and is slightly more than the sum ascertained upon the apportionment made by the Commission, but not adopted by it.

As to the amount of expenditures made to take care of current repair and maintenance, there is no controversy; but appellant contends that it should be permitted to earn annually, in addition to the amount necessary to make current repairs, a sum sufficient to make good the annual depreciation, and to replace the parts of property when they become so deteriorated as to be no longer usable. All the evidence is to effect that there is at all times going on in a plant of this character a depreciation that cannot be overcome by repair. It is rare that any physical property impaired by time and use can be so repaired as to be equivalent to the same property new. There comes a time in the life of the physical units when they can no longer be made usable by repair, and they must be discarded and replaced by new properties, which requires the expenditure of capital. Such depreciation has been held by the federal Supreme Court to be a proper element of expense.

In *Knoxville v. Knoxville Water Co., supra,* Mr. Justice Moody, speaking for the court, said:

"Before coming to the question of profit at all, the company is entitled to earn a sufficient sum annually to provide, not only for current repair, but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued, the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster, either to the stockholders or to the public or both."

We cannot improve upon this reasoning. The Commission refused to consider any sum as a separate item for depreciation, but allowed, in addition to the amount found necessary for current repair, approximately $3,000, and treated current repair maintenance and reconstruction maintenance as one item, properly chargeable to the same account. The difference between the findings of the Commission and the contention of appellant consists of a difference in the method of accounting and the amount that should be allowed for depreciation, rather than a difference upon the legal principle involved. The findings of the Commission recognize that there is a depreciation or cost of reconstruction, as parts are discarded, that must be defrayed by the earnings of the property. The evidence discloses that appellant, during the year 1908, expended only the sum of $1,340.60 in replacing depreciated properties; and the Commission attaches much importance to this fact in finding that the approximate sum of $3,000, in addition to current repair, will be sufficient to cover

depreciation. We do not think this finding is supported by the record. The sum of $1,340.60, expended for replacement and re-construction in 1908, does not represent the annual depreciation in all the property of that plant for that year. It represents only the cost of those units that had become so badly depreciated that they had to be replaced during that year. All the other properties of the plant, not replaced during that year, such as poles, wires, cables, and switchboards, deteriorated some from use and from exposure to the elements. This depreciation was not represented in the sum expended for reconstruction. Several witnesses, experts in the knowledge of constructing and operat-ing telephone plants, testified as to the amount of this annual de-preciation. Some of them testified that in a plant the size and character of this the annual depreciation would equal 8 per cent. of the reproductive value of its physical properties, and others testified that it would equal 7 per cent. No witness testified on behalf of the state or of appellee upon this question, except the auditor of the Commission. He admits there is a depreciation that cannot be taken care of by current repair, but was unable to testify from his experience the amount of same. Mr. Player, the telephone expert of the Commission, who throughout the pro-ceeding has demonstrated himself to be proficient in telephone construction and operation, and whose fairness is attested by the fact that his opinion and estimate, wherever the same were given, have been adopted by all parties, did not testify upon this question, and was not questioned relative thereto. He had ex-amined the plant, and was familiar with its properties and con-struction, its location, and all the circumstances surrounding the same. Failure of the appellees to attempt to rebut the evidence of the several witnesses testifying that the annual depreciation of this plant would be from 7 to 8 per cent. can be interpreted in no other way than that said evidence was recognized as ap-proximately correct.

Just what amount should be allowed annually for deprecia-tion of any property is difficult to determine accurately. It can only be approximated; and in so doing many things must enter

into consideration, such as the class and character of the property, its condition when placed in the plant, the location, the usage to which it is subjected, and, where electrical properties are involved, another element must be considered. The last decade has witnessed great progress in electrical sciences and appliances, and constant improvement is being made in electrical machinery and equipment of all kinds. Telephone instruments and equipments are no exception to this rule. Equipments that at any given time are regarded as adequate and the most modern are in a short time, because of new inventions and improvements, inadequate and obsolete, and must be discarded before they are worn out. This loss is in the nature of depreciation, and is usually classed as such. *Dodgeville v. Dodgeville Electric Light & Power Co.*, 2 Wis. Ry. Com. Rep. 392. In the foregoing case the amount of annual depreciation in an electric light plant was involved, and held to be 5 per cent. of the value of the property. In the opinion it is said that the depreciation will vary from 5 to 10 per cent., depending upon the circumstances of each case. We think, under the evidence in this case, that 7 per cent. of the reproductive value of the physical property is fair and sufficient to allow for annual depreciation, which amounts to the sum of $6,626.45. In so finding we fix no arbitrary rate as amount to be allowed for depreciation in all cases wherein are involved telephone properties. The amount allowed in each case must, in a large measure, be determined by the facts therein.

Schedule of all the items, of annual expense, including those as found by the Commission, to which no objection has been made, and those found by the Commission, as here modified, is as follows:

Operating expense _____ $16,239.22
Maintenance _____ 4,229.05
General expense _____ 3,175.31
Insurance _____ 322.44
Depreciation _____ 6,626.45
Taxes _____ 1,068.16

                                                $31,660.63

The foregoing aggregate sum of $31,660.63 includes more, however, than the actual expenses of operating appellant's exchange at Enid. It includes the expenses incurred by appellant at Enid in handling toll business over its long-distance lines connected with the Enid exchange. As the question of toll rates is not involved in this proceeding, it follows that the expense of conducting the toll business at Enid should be ascertained and deducted from the foregoing total expenditures, in order to determine the total annual expenses of operating the exchange at that point. Owing to the fact that some of appellant's employees at Enid devote their attention both to exchange and toll operation and maintenance, and the same building is used for both, no separate account of expenses for operating each of these businesses has been kept; and it appears from the evidence that it would be difficult, if not impossible, to keep a separate account thereof, as long as the same is operated as it is now operated. The evidence establishes that where a toll line enters a city, where the company owning the toll line does not own the exchange, and the toll business is conducted by the local exchange, the customary price paid in this state for the services of the local exchange in taking care of the toll business ranges from 10 to 15 per cent. of the toll business handled. But appellant's witnesses testify that if this total expenditure at Enid be apportioned between the toll business and the exchange business in proportion to the space occupied in the building by these respective businesses, and in proportion to the labor used in the toll business to that used in the exchange, 20 per cent. of the toll business handled at Enid will be a fair apportionment for this service.

The Corporation Commission finds upon this question in the following language:

"The toll lines of the appellant in the state of Oklahoma are operated by the local exchanges, and are maintained within the incorporate limits of towns by the same force that maintains the local exchange. The only maintenance of the long-distance lines that is not cared for by the local exchange is between exchanges. The operation of these lines is performed entirely by the local exchanges, for which the appellant insists a sufficient

amount should be allowed the exchanges out of the long-distance service to pay for this operating expense, which it claims will require 20 per cent. in and out. In this computation nothing is taken into consideration for the service rendered by the local operators, and nothing is allowed the exchange for collecting and distributing these long-distance calls. As suggested above, apportionment of toll revenues between long-distance service and the local exchanges can only be done on some arbitrary basis. *There should be a sufficient amount apportioned to the long-distance lines to properly care for same and to pay interest on the investment, and a reasonable profit. The Commission is of the opinion that 30 per cent. in and out credit to the exchanges would be a fair division of the proceeds.* It is shown from the testimony that the money collected for long-distance service at Enid for the year 1908 was $17,562 (cents are omitted in all figures); that only an estimated amount of outgoing business can be ascertained. The appellant in its statement credits the Enid exchange with $7,076, same being 20 per cent. of both outgoing and incoming messages, which would make the total outgoing and incoming $35,380. The Commission finds that 30 per cent. of the outgoing and incoming messages should be credited to the exchanges, which, in this instance, would be $10,614, making a total revenue accruing of $40,386. When it is considered that out of this $10,614, it requires an amount sufficient to pay for the actual operation of the toll service, it may very readily be assumed that 30 per cent. is not an excessive amount. *This leaves 40 per cent. for the maintenance of the long-distance lines and to pay the interest thereon, which will produce a net income that would pay a large per cent. on the investment."* (Italics are ours.)

In the final estimate of the Commission, however, the finding that 30 per cent. should be charged to the toll business was, without any reason given therefor, changed to 25 per cent. It will be observed from the italicized words in the findings of the Commission that the basis upon which the Commission has distributed these expenses was not upon what the evidence shows to be the cost of obtaining similar service, when it is rendered by an exchange owned by a company other than the company operating the the toll lines; nor is it based upon any proportion of the property of the company at Enid, or of its employees used there in the service of the toll business and in the service of the

exchange. Its finding is based upon the theory that a sufficient amount of toll business revenues should be apportioned to the toll business to pay the expense of maintaining the long-distance lines and to pay interest or profit thereon, and the balance should be credited to the local exchange. This, in our opinion, is a false theory; and, if pursued in all cases would work injustice to the customers of the toll lines. This theory of apportionment does not take into consideration the cost or value of the services rendered by the local exchange. It considers only the gross earnings of the toll business, the cost of service outside of the local exchange, and a fair income to the company on that business. Applying this theory of apportionment, if the toll tariff was excessive, the excessive revenues derived therefrom, over and above sufficient to pay for maintenance of the long-distance lines and for an income to the company, would be used to reduce the rates of the customers of the local exchange. This would lead to a discrimination in favor of the customers of the local exchanges, as against the customers of the toll lines. Customers of the toll lines should not be charged more than a reasonable charge for the services they receive, and the company rendering such service is entitled to earn sufficient only to cover the expense of such service, and to yield a reasonable dividend upon the capital invested in rendering that service.

It follows that the exchange should be credited, not with an amount based upon the earnings of the toll lines, but with an amount that represents the cost of the services rendered by the exchange. We adopt the highest esimate which the evidence in the record supports, which is 20 per cent. of the ingoing and outgoing toll business at Enid, and gives a total of $7,076.31, upon the basis of the amount of revenues for the year 1908. In addition to the foregoing expense of the toll business, said business uses some of the poles of the local exchange to support its wires and cables for which there was allowed an anual rental of 37½ cents per pole, amounting to the total sum of $963.70. About this item there is no dispute. These two items make an aggregate sum of $8,040.04, as the total expense of the toll bus-

iness which should be deducted from the above-mentioned sum of $31,660.63 to arrive at the expense of furnishing exchange service in the town of Enid for the year 1908, which gives the sum of $23,620.59.

When this appeal was taken appellant superseded the order appealed from, and pending this appeal it has been charging the schedule of rates which appellees seek to have reduced. At the rehearing it was proved that the present rates for the year 1908 produced a revenue of $29,772.43, including a small amount of commissions for handling telegrams for telegraph companies. The auditor for the Corporation Commission testifies that the revenue for the same year, at the rates prescribed by the order appealed from, would have been $5,597.71 less than the sum received under the present schedule of rates, or would have yielded revenue in the total sum of $24,174.72. Deducting from this last sum the expenses for that year in the sum of $23,620.59 gives $554.12 as the net revenue the company would have received for the services rendered by it during the year 1908, if the rates promulgated by the Commission had been charged, which would be approximately an earning of one-half of 1 per cent. on the present value of the plant over expenses and depreciation. That this schedule of rates would not yield an adequate return on appellant's property and would amount to a taking of its property without compensation, requires no discussion; and it is not contended by any one in this proceeding that the order appealed from should be permitted to stand.

The sole question here is: Shall the present rates be reduced? If so, how much? The net earnings for 1908, under the present rates, after deducting expenditures, was $6,151.84. This is an earning of approximately 5.5 per cent. on the sum of $113,596.42, the present value of the plant. As to what rate appellant may be permitted to earn without constituting an unreasonable charge for the service rendered, and as to the exact rates below which would not be held to yield a reasonable and fair return to appellant it is unnecessary here to decide. The Commission in making its estimates and suggestions has treated an earning of

8 per cent. on the present value of its property as a fair rate appellant is entitled to earn. It is likewise, however, unnecessary to decide whether this rate is the limit above which would be unreasonable and oppressive to the public, or below which would be unreasonable and unjust to the company. It is sufficient, for the purpose of this case, if the rates or charges now maintained by the company, yielding a net return to appellant of approximately 5.5 per cent. per annum, are not excessive or unreasonable to the public for the service rendered; for if they are not, they should be permitted to stand.

It is obvious that a charge for services that pays only the expenses and fixed charges, economically incurred in the rendering of such services, and yields only a fair and reasonable interest or income upon the capital invested, is not an unreasonable or oppressive charge to the purchaser of that service. The legal rate of interest in this state, in the absence of any contract, is 6 per cent., and by contract the parties may agree upon any rate not to exceed 10 per cent. Discussing the question now under consideration, the Supreme Court of Pennsylvania, in *Brymer v. Butler Water Company,* 179 Pa. 231, 36 Atl. 249, 36 L. R. A. 260, said:

"By what rule is the court to determine what is reasonable and what is oppressive? Ordinarily that is a reasonable charge or system of charges which yields a fair return upon the investment. Fixed charges and the cost of maintenance and operation must first be provided for; then the interests of the owners of the property are to be considered. They are entitled to a rate of return, if their property will earn it, not less than the legal rate of interest; and a system of charges that yields no more income than is fairly required to maintain the plant, pay fixed charges, and operating expenses, provide a suitable sinking fund for the payment of debts, and pay a fair profit to the owners of the property cannot be said to be unreasonable."

What is a reasonable return in any case upon the property invested is determined in a great measure by the character of the investment and the amount thereof, and the return other investments of similar character and amount in the same community yield, and the prevailing rate of interest. No definite

rate can be fixed to be arbitrarily applied in all cases and in all character of investments. Investments in telephone properties in this state, both on account of the constant change and improvement in telephone appliances and equipments and on account of the undeveloped condition of the cities and towns of the state, cannot be regarded as investments of such high character as state or federal bonds, or as they would be in communities where the demands for such service is established and more definitely ascertainable than where it is subject to the varying changes of a rapidly developing country. We therefore conclude that the schedule of charges now being made by appellant, yielding to it a return upon the value of its property less than the legal rate of interest in this state, cannot be said to be unreasonable or an oppressive schedule of charges.

No complaint is made in this proceeding that this schedule of rates discriminates in favor of one class of customers as against others; the sole purpose of this proceeding being to obtain a horizontal reduction of rates. The order of this court, therefore, will be that the order appealed from be set aside, and that the schedule of rates charged by appellant at the time of the institution of this proceeding shall be the rates hereafter charged by it, until further orders made in pursuance of law. It is well to observe, however, in this connection that the force and effect given to an order of this court, such as the one here made, is defined by section 23 of article 9 of the Constitution to be the same as if entered by the Commission at the time the original order appealed from was entered. If subsequent experience in the operation of appellant's exchange at Enid develops that the rates here promulgated operate oppressively upon the public, or that they fail to render to appellant, because of changing conditions in the city or of cost of operation, a reasonable return upon its property, either party has a remedy for relief by application to the Corporation Commission, and establishing such facts.

All the Justices concur.