(156 App. Div. 603.)

### PEOPLE ex rel. KINGS COUNTY LIGHTING CO. v. WILLCOX et al., Public Service Commission.

(Supreme Court, Appellate Division, First Department. May 9, 1913.)

1. GAS (§ 14*)—CHARGES—FIXING OF RATES—"GOING VALUE."

The "going value" of a gas plant, which is the added value of the plant as a whole over the sum of the values of the component parts, which is attached to it because it is in active and successful operation and earning a return, is an element of value of the plant for rate making by the public service commission under Public Service Law (Consol. Laws 1910, c. 48) § 72, requiring the commission in determining the price to be charged for gas to consider the facts bearing on a proper determination of a reasonable average return on the capital actually expended, etc.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*

For other definitions, see Words and Phrases, vol. 4, pp. 3103–3104.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. GAS (§ 14*)—CHARGES—FIXING RATES—ELEMENT OF VALUE.

Where the mains of a gas plant were laid in unpaved streets in an uninhabited community, and thereafter the streets were paved and the territory became settled, the public service commission in determining the value of the plant for rate making must allow the cost of repaving the streets as an element of reproduction value.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

3. GAS (§ 14*)—CHARGES—FIXING RATES—VALUE OF PROPERTY.

The value of the tangible property of a public service corporation supplying gas to consumers on which it is entitled to a rate which will procure a fair return is the value at the time of appraisement for rate making.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

4. GAS (§ 14*)—CHARGES—FIXING RATES—DEDUCTION FOR DETERIORATION.

In the absence of accurate evidence of actual value of a gas plant for rate making, the cost of reproduction at the time of appraisement for rate making will take the place thereof, but the cost of reproduction represents the actual condition at the time, and there must be a deduction for depreciation which represents the amount required to replace the apparatus, still in use but in process of wearing out, at the end of useful service.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

5. GAS (§ 14*)—CHARGES—RATE MAKING—ANNUAL INCREASE OF PROPERTY.

The Public Service Commission in fixing value of a gas plant for rate making may not include in its calculation of income an item representing the annual increase in the value of the land actually used and appropriate for the business of the plant.

[Ed. Note.—For other cases, see Gas, Cent. Dig. §§ 10–11; Dec. Dig. § 14.*]

Certiorari by the People, on the relation of the Kings County Lighting Company, against William R. Willcox and others, composing and constituting the Public Service Commission of the State of New York for the First District, to review a determination of the Commission fixing the rate to be charged by relator for gas for the years 1912 and 1913. Writ sustained, and determination reversed, and matter remitted to the Commission for further action.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

O'Brien, Boardman & Platt, of New York City (Morgan J. O'Brien, of New York City, of counsel, and James F. Meagher and Swinburne Hale, both of New York City, on the brief), for relator.

George S. Coleman, of New York City, of counsel (Oliver C. Semple, of New York City, on the brief), for respondents.

Charles F. Mathewson, of New York City, amicus curiæ.

CLARKE, J. The Kings County Lighting Company was incorporated May 25, 1904, with an authorized capital stock of $2,000,000, and on July 1, 1904, was merged with the previously existing Kings County Gas & Illuminating Company, which had been incorporated

December 18, 1889, and had supplied gas since October, 1891. Upon complaint duly lodged the Public Service Commission undertook an investigation as to the reasonableness of the rates charged, and finally fixed certain rates for the future. The Commission· determined that the fair value of the property of the company for the purpose of rate making was about $2,480,000, and certainly not in excess of $2,500,-000 upon December 31, 1910, and that a fair rate of return upon the property should not exceed 7½ per cent. It therefore fixed the rate from and including November 1, 1911, to and including December 31, 1912, at 85 cents per thousand cubic feet. From and including January 1, 1913, to and including December 31, 1913, 80 cents per thousand cubic feet. It is the contention of the company that the fair value of its property was at least $2,000,000 in excess of the amount fixed.

Section 72 of the Public Service Commission Law (chapter 48, Cons. Laws 1910; chapter 480 of the Laws of 1910) provides that:

"In determining the price to be charged for gas or electricity the Commission may consider all facts which in its judgment have any bearing upon a proper determination of the question although not set forth in the complaint and not within the allegations contained therein, with due regard among other things to a reasonable average return upon capital actually. expended and to the necessity of making reservations out of income for surplus and contingencies."

The Commission attempted to conform to the accepted rule of valuation. In Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819, Harlan, J., said:

"We hold, however, that the basis of all calculations as to reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount in market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed· by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth."

In San Diego Land & Town Co. v. National City, 174 U. S. 757, 19 Sup. Ct. 811, 43 L. Ed. 1154, Harlan, J., said:

"What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public."

In Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, Moody, J., said:

· "The first fact essential to the conclusion of the court below is the valuation of the property devoted to the public uses, upon which the company is entitled to earn a return."

The Commission found as follows:

| | |
|---|---:|
| Net cost of tangible property other than land | $1,561,628 |
| Contractors' profits, engineering, administration, contingencies, and incidentals | 341,149 |
| Cost to reproduce new | $1,902,777 |
| Depreciation | 415,198 |
| | $1,487,579 |
| Land, present value | 650,000 |
| Present value of plant, etc. | $2,137,579 |
| Preliminary and development | 260,000 |
| Working capital | 80,000 |
| Total | $2,477,579 |

The company challenges this valuation in several respects. We deem it necessary to consider only the following.

[1] 1. *Going Value.* It claims that as an established business there should have been added an item for "going value" of $600,000, the smaller of the estimates given by its two expert witnesses. In condemnation cases this has been settled by the Supreme Court of the United States.

In Omaha v. Omaha Water Company, 218 U. S. 180, 30 Sup. Ct. 615, 54 L. Ed. 991, the question was as to the amount to be paid by a municipality on taking over a system of waterworks. Nearly $600,-000 had been allowed by the appraisers for going value. The court said:

"The option to purchase excluded any value on account of unexpired franchise; but it did not limit the value to the bare bones of the plant, its physical properties, such as its lands, its machinery, its water pipes or settling reservoirs, nor to what it would take to reproduce each of its physical features. The value in equity and justice must include whatever is contributed by the fact of the connection of the items making a complete and operating plant. The difference between a dead plant and a live one is a real value, and is independent of any franchise to go on, or any mere good will as between such a plant and its customers. * * * That there is a difference between even the cost of duplication, less depreciation, of the elements making up the water company's plant, and the commercial value of the business as a going concern, is evident. Such an allowance was upheld in National Waterworks v. Kansas City, 62 Fed. 853, 10 C. C. A. 653, 27 L. R. A. 827, where the opinion was by Mr. Justice Brewer. We can add nothing to the reasoning of the learned justice, and shall not try to. That case has been approved and followed in Gloucester Water Supply Co. v. Gloucester, 179 Mass. 365 [60 N. E. 977], and Norwich Gas & Electric Co. v. Norwich, 76 Conn. 565 [57 Atl. 746]. No such question was considered in either Knoxville v. Knoxville Water Co., 212 U. S. 1 [29 Sup. Ct. 148, 53 L. Ed. 371], or in Willcox v. Consolidated Gas Co., 212 U. S. 19 [29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034]. Both cases were rate cases, and did not concern the ascertainment of value under contracts of sale."

It is true the question has not been directly decided in a rate case in the United States Supreme Court. In the Knoxville Case, supra, Mr. Justice Moody said of the valuation:

"It was made up by adding to the appraisement in minute detail of all the tangible property the sum of $10,000 for 'organization, promotion, etc.,' and $60,000 for 'going concern.' The latter sum we understand to be an expres-

sion of the added value of the plant as a whole over the sum of the values of its component parts, which is attached to it because it is in active and successful operation and earning a return. We express no opinion as to the propriety of including these two items in the valuation of the plant, for the purpose for which it is valued in this case, but leave that question to be considered when it necessarily arises. We assume, without deciding, that these items were properly added in this case."

And the United States Supreme Court again left the question undecided in Cedar Rapids Gaslight Co. v. Cedar Rapids, 223 U. S. 665, 669, 32 Sup. Ct. 389, 390 (56 L. Ed. 594), Holmes, J., saying:

"Then again, although it is argued that the court excluded going value, the court expressly took into account the fact that the plant was in successful operation. What it excluded was the good will or advantage incident to the possession of a monopoly, so far as that might be supposed to give the plaintiff the power to charge more than a reasonable price. * * * In this case the court fixed a value on the plant that considerably exceeded its cost and estimated that under the ordinance the return would be over 6 per cent. Its attitude was fair, and we do not feel called upon to follow the plaintiff into a nice discussion of details."

But "going value" has been considered and allowed for in the following rate cases: Missouri, Kansas & Texas R. R. Co. v. Love (C. C.) 177 Fed. 493, 496; Shepard v. Northern Pacific R. R. Co. (C. C.) 184 Fed. 765, 810; Des Moines Water Co. v. Des Moines (C. C.) 192 Fed. 193, 197; Pioneer Tel. & Tel. Co. v. Westenhaver, 29 Okl. 429, 118 Pac. 354, 38 L. R. A. (N. S.) 1209.

I am unable to perceive a logical difference between allowing "going value" in the valuation of a plant when it is to be taken entirely by the public and allowing the same element when valuing the same plant for rate making purposes. In each case the thing to be done is the fair appraisement of present value. What difference in principle can there be because in one instance all is taken for the use of the public and in the other the public limits the earnings? In the case at bar the Commission says it "disallowed this claim in determining fair value, * * * but did consider it in fixing the rate of return." If so, there is no proof of that fact in the record.

2. *The present value of the city paving over mains and services.* While as to other items of physical property the Commission professed to appraise at its full value, and to apply the rule of cost of reproduction new, less accrued depreciation, it refused to include in the value of mains under paved streets more than the original cost of repaving when the mains were laid. When the mains were laid, the streets were unpaved, sandy tracts in an unbuilt-up community. Mr. Connette, the engineer for the Commission, placed the cost for restoring pavement as it existed when the services were laid at $12,717. That amount was allowed by the Commission in its valuation. Mr. Baehr estimated the cost of reproducing the existing paving over mains and services as they existed January 1, 1911, at $264,066. Mr. Connette's figures upon that basis were $212,808. The relator claims that the valuation should have included this amount to the extent of at least $200,000.

In the Consolidated Gas Case (C. C.) 157 Fed. 849, the difference between book value or original cost and the replacement cost or cost

of reproduction of mains and services was about $5,560,000. Judge Hough, said:

"The complainant demands a fair return upon the reproductive value thereof, which is the same thing as the present value properly considered. * * * Upon authority, I consider this method of valuation correct. What the court should ascertain is the 'fair value of the property being used' (Smyth v. Ames, 169 U. S. at page 546 [18 Sup. Ct. at page 434, 42 L. Ed. 819]); the 'present' as compared with 'original' cost; what complainant 'employs for the public convenience' (169 U. S. at page 547 [18 Sup. Ct. at page 434, 42 L. Ed. 819]); and it is also the 'value of the property at the time it is being used' (San Diego Land Co. v. National City, 174 U. S. at page 757 [19 Sup. Ct. at page 811, 43 L. Ed. 1154]). And see, also Stanislaus County v. San Joaquin Co., 192 U. S. 201 [24 Sup. Ct. 241, 48 L. Ed. 406]. It is impossible to observe this continued use of the present tense in these decisions of the highest court without feeling that the actual or reproductive value at the time of inquiry is the first and most important figure to be ascertained. * * * The complainant by itself and some of its constitutent companies has been continuously engaged in the gas business since 1823. A part of the land in question has been employed in that business for more than two generations, during which time the value of land upon Manhattan Island has increased even more rapidly than its population. So likewise the construction expense, not only of buildings, but of pipe systems now consisting of continuous sheets of asphalt over granite, has enormously advanced. The value of the investment of any manufacturer in plant, factory, or goods, or all three, is what his possessions would sell for upon a fair transfer from a willing vendor to a willing buyer, and it can make no difference that such value is affected by the efforts of himself or others, by whim or fashion, or (what is really the same thing) by the advance of land values in the opinion of the buying public. It is equally immaterial that such value is affected by difficulties of reproduction. If it be true that a pipe line under the New York of 1907 is worth more than was a pipe line under the city of 1827, than the owner thereof owns that value, and that such advance arose wholly or partly from difficulties of duplication created by the city itself is a matter of no moment. Indeed, the causes of either appreciation or depreciation are alike unimportant, if the fact of value be conceded or proved."

The Supreme Court said (Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034):

"And we concur with the court below in holding that the value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property, which legally enters into the consideration of the question of rates, has increased in value since it was acquired, the company is entitled to the benefit of such increase. That is, at any rate, the general rule."

It seems to me that we ought to regard that question as settled. The fact that these streets have been paved and the region generally improved has caused sales of land, the building of houses, and the increase in population, which has enabled the company within the last few years to make profits, and declare dividends which for many years it was unable to do. The argument that streets paved or unpaved make no difference in the earning power of a gas company is unsound. The earning power of a gas plant depends upon its constituency. If it has nobody to sell gas to, it can make no profits; and, if there are no decent streets, there will be few people. The value of a plant of any kind is certainly affected by its location and the demand for its products. If a new company undertook to install a duplicate plant, the cost of repaving under the present streets would

properly be allowed for. Hence it is a necessary element of reproduction value. It is a valuable advantage which the present owner has which a prospective buyer would have to pay for. Like increased land values a school of thought might condemn it as "unearned increment," but the law does not yet refuse to include it in its definition of property capable of ownership and entitled to protection.

[3, 4] 3. *Depreciation.* The Commission said:

"Cost of reproduction new is not necessarily an indication of present value. Depreciation and deferred maintenance are important factors."

It held that the proper method to ascertain the value of the tangible property was to take the amount obtained by subtracting from the cost of reproduction its accrued depreciation, and therefore from its estimate of reproduction cost new subtracted $415,198 for depreciation.

The relator contends that this method is fundamentally unsound, that said sum should not be deducted, but that the true rule is that the company is entitled to earn a return on the full 100 per cent. service of its investment. That the fair value for rate making purposes is equal to the total cost of reproduction less scrap value, without any deduction whatever for accrued depreciation. That, therefore, the Commission's total valuation is in error to the extent of the difference between said amount and Mr. Connette's total of scrap value, $183,150, or making in round numbers an amount of $230,000 which would be added to the total valuation.

Mr. Mathewson as amicus curiæ files an interesting brief presenting an elaborate argument in support of the proposition that as it is conceded that the plant of the relator operates at 100% of efficiency there should be no deduction for so called "accrued depreciation." This term is used to designate, somewhat inartificially, the liability presently accrued toward the ultimate cost of replacement of still efficient apparatus. He therefore repudiates the concession to scrap value and claims that as the company, being a public service corporation, must always keep its plant up to efficiency, and must replace property when worn out, it is entitled to a rate based upon 100 per cent. efficiency because it will never be allowed to capitalize replacement but must provide it when necessary. It therefore must be allowed to provide a replacement fund out of its earnings. He argues that it makes no difference to the consumer whether that fund is actually accumulated and on hand or not, because the replacement must be made, if there is such a fund, from it; if not, by the stockholders directly. If, on the other hand, the valuation of the tangibles is reduced by a percentage, in this case 21 per cent., it can never be provided for in the only proper way—out of earnings.

We are unable to adopt Mr. Mathewson's interesting theories for these reasons:

(1) It seems to be thoroughly established that the value of the tangible property upon which the company is entitled to a rate which will procure a fair and just return is the present value; that is, at the time of the appraisement for rate making purposes.    .    .   ..

(2) That in the absence of accurate evidence as to actual value the cost of reproduction new takes the place thereof.

(3) That as the property being valued is not new, in order that "cost of reproduction new" may represent the actual condition—the amount presently invested—there must be a deduction therefrom.

(4) That this represents the amount required to replace apparatus still in use, but in process of wearing out, at the end of useful service.

(5) That this allowance for depreciation has been made in various kinds of cases where present value is required to be estimated.

In condemnation or contract cases, where a city has reserved the right to take a plant at the end of a given number of years at a fair and just appraisement (Omaha v. Omaha Water Co., 218 U. S. 180, 30 Sup. Ct. 615, 54 L. Ed. 991); in special franchise cases (Jamaica Water Supply Case, 196 N. Y. 39, 89 N. E. 581; People ex rel. Manhattan Ry. Co. v. Woodbury, 203 N. Y. 231, 96 N. E. 420; People ex rel. Third Ave. R. R. Co. v. Tax Com'rs, 136 App. Div. 155, 120 N. Y. Supp. 528; affirmed 198 N. Y. 608, 92 N. E. 1098), and in rate cases (San Diego Land & Town Co. v. National City, 174 U. S. 739, 19 Sup. Ct. 804, 43 L. Ed. 1154; San Diego Land Co. v. Jasper, 189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892; Stanislaus County v. San Joaquin & K.'s & I. Co., 192 U. S. 201, 24 Sup. Ct. 241, 48 L. Ed. 406; Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371).

In the special franchise tax cases the proper valuation of the present value of the tangible property of the company was directly involved and of the utmost importance. The formula worked out by the Court of Appeals in the Jamaica Water Co. Case, 196 N. Y. 39, 89 N. E. 581, was as follows: .

"The net earnings rule contemplates a valuation upon the basis of the net earnings of the corporation which are attributable to its enjoyment of the special franchise. The method is thus applied: (1) Ascertain the gross earnings. (2) Deduct the operating expenses. (3) Deduct a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property. The resulting balance gives the earnings attributable to the special franchise. If this balance be capitalized at a fair rate, we have the value of the special franchise."

It thus appears that a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property required the determination of how that capital so invested should be fixed.

In People ex rel. Manhattan Ry. Co. v. Woodbury, 203 N. Y. 231, 96 N. E. 420, which was a special franchise tax case, Gray, J., said:

"The courts below determined that the relator was entitled to make annual depreciation charges * * * for the purpose of creating a fund to provide for the depreciation of its various properties, upon which interest at 4 per cent. compounded would produce a sum at the termination of the ascertained physical life of the several classes of property equal to the cost of the particular property. While I am personally of the opinion that the creation of such an amortization fund furnishes the best rule for adoption in such a case as this, in working out the value of special franchises, the majority of my Brethren entertain a different view. They think that the annual allowances for depreciation should be computed by dividing the values of the various

kinds of tangible property by the number of years of their respective estimated physical lives, and that will be the opinion of the court."

Haight, J., said:

"In the Jamaica Water Supply Co. Case, 196 N. Y. 39 [89 N. E. 581], we held that there should be an annual deduction made out of gross earnings in order to meet the general deterioration of the property and provide for its replacement. Willard Bartlett, J., in delivering the opinion of the court, says: 'We suppose that judicial notice may be taken of the fact that in the conduct of many industrial enterprises there is a constant deterioration of the plant which is not made good by ordinary repairs which, of course, operates continually to lessen the value of the tangible property which it affects. The amount of this depreciation differs in different enterprises, but the annual rate is usually capable of estimate and proof by skilled witnesses. No corporation would be regarded as well conducted which did not make some provision for the necessity of ultimately replacing the property thus suffering deterioration; and we cannot see why an allowance for this purpose should not be made out of the gross earnings in order to ascertain the true earning capacity.' In the case of People ex rel. Third Ave. R. R. Co. v. State Board of Tax Commissioners, 136 App. Div. 155 [120 N. Y. Supp. 528], Kellogg, J., in delivering the opinion of the Appellate Division, after referring to our decision in the Jamaica Case, says that 'a public service corporation, with reference to its property which will become worthless by use and must be replaced, is entitled to set aside each year from its earnings a reasonable sum to provide for its replacement. This is outside of the ordinary annual expenses for maintenance, renewals and repairs.' "

This case was affirmed in this court without opinion in 198 N. Y. 608, 92 N. E. 1098. After referring to the rule laid down by the Special Term of amortization, he proceeded:

"The difficulty with such holding is that railroad corporations do not reconstruct their railroads and rolling stock in that way. In order to afford proper protection to the public, they are required to maintain a high state of efficiency both in roadbed and rolling stock. * * * It is not waiting 40 or 60 years to reconstruct, during which time the amount set apart as a sinking fund may be doubled many times over by compounding the interest, but it is the annual expenditure for reconstruction which is to be paid for at the time that the construction is made. * * * I think, therefore, that we should adhere to the rule sanctioned in the Jamaica Case, and that a gross sum should be deducted annually for the purpose of reconstruction."

In considering the cases in the Supreme Court of the United States, it must be borne in mind that they were suits in equity to restrain the enforcement of rates fixed by ordinance or statute, and that the sole question presented to that court was whether the effect of such ordinance or statute was confiscatory, and hence in violation of the Constitution. Having determined the main fact for or against the constitutionality of the ordinance or statute under consideration, as applied to the facts before it, the court has paid scant attention to matters of detail not necessarily involved in the precise question before it.

So that, while in the rate cases, cited supra, it has mentioned, without discussing, reproduction cost new, less depreciation, in only one of them has it expressed its views in extenso. But in Knoxville v. Knoxville Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371, the court said, referring to the value of the tangible property:

"This valuation was determined by the master by ascertaining what it would cost, at the date of the ordinance, to reproduce the existing plant as a

new plant. The cost of reproduction is one way of ascertaining the present value of a plant like that of a water company, but that test would lead to obviously incorrect results, if the cost of reproduction is not diminished by the depreciation which has come from age and use.   *   *   *   The cost of reproduction is not always a fair measure of the present value of a plant which has been in use for many years. The items composing the plant depreciate in value from year to year in a varying degree. Some pieces of property, like real estate for instance, depreciate not at all, and sometimes, on the other hand, appreciate in value. But the reservoirs, the mains, the service pipes, structures upon real estate, standpipes, pumps, boilers, motors, tools, and appliances of every kind begin to depreciate with more or less rapidity from the moment of their first use. It is not easy to fix at any given time the amount of depreciation of a plant whose component parts are of different ages with different expectations of life. But it is clear that some substantial allowance for depreciation ought to have been made in this case.   *   *   *   The company's original case was based upon an elaborate analysis of the cost of construction. To arrive at the present value of the plant large deductions were made on account of the depreciation. This depreciation was divided into complete depreciation and incomplete depreciation. The complete depreciation represented that part of the original plant which through destruction or obsolesence had actually perished as useful property. The incomplete depreciation represented the impairment in value of the parts of the plant which remained in existence and were continued in use. It was urgently contended that in fixing upon the value of the plant upon which the company was entitled to earn a reasonable return the amounts of the complete and incomplete depreciation should be added to the present value of the surviving parts. The court refused to approve this method, and we think properly refused. A water plant, with all its additions, begins to depreciate in value from the moment of its use. Before coming to the question of profit at all, the company is entitled to earn a sufficient sum annually to provide, not only for current repairs, but for making good the depreciation, and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders; and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued, the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both. If, however, a company fails to perform this plain duty and to exact sufficient returns to keep the investment unimpaired, whether this is the result of unwarranted dividends upon overissue of securities, or of omission to exact proper prices for the output, the fault is its own. When, therefore, a public regulation of its prices comes under question, the true value of the property then employed for the purpose of earning a return cannot be enhanced by a consideration of the errors in management which have been committed in the past. After the company had closed its case, the city undertook to determine the present value of the company's property by the plain method of ascertaining the cost of reproduction, diminished by depreciation. In its case in rebuttal, the company followed the same method, though the results differed largely, and, as we have been, no proper allowance for depreciation was made."

This quotation completely answers the contention on the part of the relator that no allowance should be made for depreciation, because the evidence is that the efficiency of the relator's plant continued to

be equal to 100 per cent. since it is manifest that deterioration to some extent must precede the loss of efficiency, and the mere fact that the efficiency remains stable does not necessarily contravene the other fact that deterioration has set in.

In the case at bar the Commission followed the rule laid down by the Court of Appeals in People ex rel. Manhattan Ry. Co. v. Woodbury, supra, as to the method of estimating the depreciation and the rule indicated by the Knoxville Case of deducting the thus ascertained amount of accrued depreciation from the cost of reproduction new to ascertain the present value of the tangibles in use. We think this entirely proper, especially in view of the fact that it allowed appreciation in land values. If, in addition, there should be allowed, as we have indicated, an additional amount as for going concern and an additional amount for the cost of repaving under the present paved streets, we think that the relator will have been fairly treated.

[5] We are of opinion that upon the other matters going to make up the item of capital invested upon which a fair and reasonable return is to be calculated the decision of the Commission is right. In its calculation of income, however, it has included an item of $35,000 as the annual increase in the value of the land of the company. This we regard as erroneous. The land is used for the business of the company and is appropriate therefor. So long as the land is held and used for such purpose increase in value cannot be considered as income or as available for the payment of debts, taxes, or dividends.

Upon the argument both sides suggested that this court should make a final determination fixing the rate. This we are unwilling to do, preferring to confine ourselves to the determination of the principles to be applied, leaving the readjustment of the calculations of figures to the administrative board fully equipped for that purpose. Nor are we prepared to say that the valuation of the two items which we think should have been taken into consideration by the Commission is conclusively established. Upon the whole case we are of opinion that the Commission might well have adopted the rate offered to be consented to by the company.

Writ sustained and determination reversed, with $50 costs and disbursements to the relator, and the matter remitted to the Public Service Commission for action in accordance with this opinion. All concur.