THE PEOPLE OF THE STATE OF NEW YORK ex rel. CENTRAL HUDSON GAS AND ELECTRIC COMPANY, Respondent, Appellant, *v.* STATE TAX COMMISSION, Appellant, Respondent. (Eight separate special franchise proceedings, assessments of 1916.)

Third Department, September 23, 1926.

Taxation — special franchise tax — gross earnings — receipts by gas and electric corporation from renting appliances and from sale of merchandise incidental to business and sales of residuals, included — operating expenses — expenses connected with merchandising, rental of appliances and sales of residuals should be included — annual amount for amortization of debt expense in sale of bonds included in operating expenses — allowance for depreciation should be made by " straight line method "— amount actually set aside by relator not controlling — amount transferred to " contingency reserve " several years later not admissible to show adequacy of depreciation account — obsolescence in addition to depreciation properly allowable where machinery is replaced prior to expiration of physical life — return on present value of tangible property — return should be allowed on average bank balance, value of materials and supplies on hand and operating allowance representing two months' average expenses — cost of restoring streets after laying pipes considered as part of cost of reproduction less depreciation in determining present value — return allowable only on depreciated value of labor and materials expended in restoring streets — referee did not err in refusing to allow return on prepayments of insurance and taxes — relator entitled to return on unamortized debt expense — earnings attributable to special franchise — special franchises valued at no greater sum than proportion of surplus earnings which length of wires over public ways bears to total length — value of special franchise in town of Fishkill limited to value of unused cable — equalization — relator had right to use equalization rates established by State Tax Commission — over-assessment properly determined under net earnings rule — additional allowance properly made under Civil Practice Act, § 1513, but order must be reversed, since proceedings are remitted.

For the purpose of determining the gross earnings of a gas and electric corporation in certiorari proceedings to review the assessment of a special franchise tax,

there should be included as a part of the gross earnings, receipts from merchandise and jobbing and rent of appliances and sales of residuals, for the selling and renting of appliances useful to consumers is incidental to the business of the relator and similarly the sale of residuals was necessarily incidental to the manufacture of gas sold through operations involving the exercise of the special franchise.

There should have been included in determining the operating expenses of the relator, the expenses connected with its business of selling and renting appliances and the sale of the residuals from its gas plant.

The referee properly allowed as an operating expense the annual amount set aside by the relator for amortization of debt expense incurred in the sale of its bonds, representing such expenses as printing, commissions, lawyers' fees and like expenses which the relator incurred in selling its securities.

The referee properly allowed depreciation according to the " straight line method," that is, by making an annual allowance for depreciation computed by dividing the values of the various kinds of tangible property by the number of years of their respective estimated physical lives, and the relator was not bound by the actual amount set aside on its books for depreciation but had the right to have the " straight line method " applied.

The mere fact that seven years after the tax year in question the relator transferred a substantial sum from its depreciation account to a so-called " contingency reserve " was not admissible to show the adequacy of the relator's depreciation account for the taxable year.

It was proper for the referee to allow the sum of $27,887 for obsolescence in addition to depreciation, for that amount was allowed on account of certain machinery that was replaced by a modern type of machinery, the replacement being made before the old machinery had actually reached the limit of its physical life; depreciation did not cover that item.

In determining the present value of tangible property for the purpose of fixing a reasonable return thereon, it was proper for the referee to allow as a part of the tangible property the sum of $50,000 representing an average bank balance, and $44,552 for materials and supplies on hand, and $79,727 as an operating allowance representing two months' average expenses of the relator, since it appears that the relator has to finance its operations for an average period of two months, during which it awaits collections from its customers, and the referee should have included the relator's investments in the departments of its business devoted to the sale and rental of appliances and the sale of residuals.

The amount of money expended by relator in replacing street pavements following the placement of its property underground is properly chargeable to construction, and, therefore, the cost of the labor and materials should be considered as a part of the value of the property in paved streets less depreciation, in determining the present value of the property in the streets. Hence, the referee should not have allowed a return upon all of the moneys expended in the replacement of pavements, but should have limited the return to the depreciated value of the labor and materials expended in connection with the pavements.

While ordinarily the relator would be allowed a return upon prepayments of insurance and taxes, still in this proceeding the referee was not in error in denying a return thereon, since it appears that he made liberal provision for working capital and that at the end of the year the relator does not deduct accounts unpaid to it, amounting to much more than the prepayments mentioned.

It was error for the referee to disallow the relator's claim to a return on the amount of its unamortized debt expense,

**46** People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926. [Vol. 218

The earnings attributable to special franchises where, as in this case, the relator operates in part through public streets and in part over private rights of way, are not to be determined by the surplus of net earnings remaining after deducting therefrom a reasonable return on the value of the tangible property of the corporation, but by that proportion of such surplus earnings which the length of wires or mains over or under public ways bears to the total length of all wires or mains within the town.

The relator which merely delivered its product to the town line of the town of Fishkill to an independent corporation exercised no special franchise within that town in reference to that operation, and, therefore, its special franchise assessment in such town should have been limited to the actual value of an unused cable laid under the Hudson river within the town limits.

The State Tax Commission cannot complain because the full valuations have been equalized at the rates determined by it, on the theory that there was no evidence submitted by the relator to show an inequality of assessments to the detriment of the relator. Where the relator did not properly tender the issue of inequality, it had the right to adopt the State Tax Commission's own rates of equalization.

The relator had the right to show that it was over-assessed by the use of the net earnings rule, since nothing appears to make the net earnings rule an improper basis of value, and since the parties have proceeded upon the theory that such rule was the proper method of assessment.

The court had the power under section 1513 of the Civil Practice Act, in its discretion, to make an additional allowance for costs to the relator and it properly exercised that discretion, but, in view of the fact that the orders based upon the report of the referee are reversed and the proceedings remitted, the order granting an additional allowance must likewise be reversed.

Hinman, J., dissents as to paragraphs 3, 10 and 11.

Appeal by the defendant, State Tax Commission, from separate final orders of the Supreme Court, entered in the office of the clerk of the county of Albany on the 12th day of November, 1924, upon the report of a referee appointed to take evidence and to hear, try and determine the whole issues raised by the petitions and the returns in certiorari proceedings to review special franchise assessments for the year 1916, within the respective cities and towns.

Appeal by the relator, Central Hudson Gas and Electric Company, from said final orders in so far as they fail to reduce the full value of the franchise of the relator within the respective cities and towns and fail to direct the correction of the assessment roll and to provide for a refund.

Appeal by the defendant, State Tax Commission, from an order of the Supreme Court, made at the Albany Trial Term and entered in the office of the clerk of the county of Albany on the 12th day of November, 1924, granting to the relator in each of said proceedings an additional allowance of costs as specified and allocated in said order, pursuant to section 1513 of the Civil Practice Act.

It was stipulated that the proceedings be tried together; that

the referee render one report or decision covering all proceedings and that separate orders in each of said proceedings be made and entered upon the report of the referee. The final orders provided for a reduction in the amount of the assessments. The relator is engaged in the manufacture and sale of gas, electricity and steam. Its main office is located in Poughkeepsie and it serves a territory extending through Dutchess, Orange and Ulster counties. It had two generating stations, one in Poughkeepsie and the other in Newburgh. It also had a gas plant in each of those cities. These plants served those cities and surrounding territory and the electric plants supplied transmission lines in the various towns involved in these proceedings. These transmission lines were in large part upon private right of way. The transmission and distribution systems were located partly in and partly outside of streets, highways and public places and the greater part of the relator's receipts were derived from sales of gas, electricity and steam over the transmission and distribution property which was located partly in and partly outside of streets, highways and public places. Relator manufactured steam at its Newburgh station, which served customers in the city of Newburgh. The relator also sold electric energy directly from its generating stations at Poughkeepsie and Newburgh to two separate street railway companies. Other whole-sale customers received electric energy over private rights of way directly from substations located on the transmission lines.

The referee has found that the relator's special franchise valuations for the year 1916 are to be determined by the status of the relator on June 30, 1915, and its operations during the year then ended and that the proceedings were tried on that basis by both parties. Upon the trial both parties employed the figures shown by the relator's report, which shows the balance sheet of the company, the reproduction and present valuations of property both in and out of streets, operating receipts, operating expenses and taxes and other information required by the Tax Commission. None of the facts and figures in the report were put in issue by the respondent in its returns, excepting the present values of tangible property in and out of streets.

The questions presented by these appeals relate to the application of the net earnings rule to the operations of the relator for the year in question for the purpose of ascertaining the full value of relator's special franchise.

As an incident to the respondent's appeal on the main case, the respondent appeals from an order granting to the relator an additional allowance for costs under section 1513 of the Civil Practice Act.

**48** People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926.          [Vol. 218

*Gould & Wilkie* [*R. L. von Bernuth, John L. Wilkie* and *M. S. Lockhart* of counsel], for the relator, appellant.

*Albert Ottinger, Attorney-General* [*John M. Farrell* and *Frederic J. Merriman* of counsel], for the respondent, appellant.

Hinman, J. " The net earnings rule contemplates a valuation upon the basis of the net earnings of the corporation which are attributable to its enjoyment of the special franchise. The method is thus applied: (1) Ascertain the gross earnings. (2) Deduct the operating expenses. (3) Deduct a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property. The resulting balance gives the earnings attributable to the special franchise. If this balance be capitalized at a fair rate we have the value of the special franchise." (*People ex rel. Jamaica Water Supply Co.* v. *Tax Commissioners*, 196 N. Y. 39, 56.) The matters of difference in the case at bar will be presented in the above general order.

(1) Gross earnings. · The referee and both parties agree upon the figure representing gross receipts from operations in the manufacture and sale of gas, electricity and steam, except that the referee adopted the contention of the relator that its receipts for merchandise and jobbing and rent of appliances and sales of residuals should not be included. The respondent contends that these receipts should have been included. In similar appeal involving the valuation of relator's special franchise for the years 1917, 1918 and 1919, decided herewith (218 App. Div. 60), it appears that the referee added the receipts from these three sources to the gross revenues. We think that the referee should have added such receipts in this case also. The business of selling and renting appliances useful to consumers of gas and electricity is a business incident to the manufacture and sale of gas and electricity in the prudent and economical management of that business in which the relator enjoyed the exercise of its special franchise. Such sales and rentals tended to increase the amount of gas and electricity sold through the exercise of such franchise and thus made the intangible value of relator's property greater. It is apparent that it was only this indirect profit from increased use of gas and electricity which was contemplated or obtained by the relator. Similarly the sale of residuals was necessarily incident to the manufacture of gas sold through operations involving the exercise of the special franchise. The residuals sold were such by-products as coke. The sale of such by-products directly affected the net revenue in the gas business by lessening the cost of the manufacture of gas. In the other appeal involving the assessments for the succeeding years

People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.  **49**

App. Div. 44]        Third Department, September, 1926.

counsel for relator concedes in his brief the propriety of including receipts from sales of residuals in the gross earnings, on the ground that they are receipts from operations in some way necessarily connected with relator's manufacture and sale of gas. We conclude that the referee erred in omitting from gross earnings the receipts from merchandise and jobbing, rent of appliances and sale of residuals.

(2) Operating expenses. The referee having failed to include receipts from merchandise and jobbing, rent of appliances and sale of residuals, likewise excluded the expenses connected therewith. Inasmuch as these receipts should have been included the expenses connected therewith should likewise have been included as items of operating expenses.

The relator sought, and the referee allowed, under operating expenses a deduction of $4,623 on account of "amortization of debt, discount and expense." The respondent complains of such deduction. This item represents the annual amount set aside by the relator for amortization of debt expense incurred in the sale of its bonds, representing such expenses as printing, commissions, lawyers' fees and like expenses which the company incurred in marketing such securities. It does not include debt discount. It is the opinion of the court, as expressed in the opinion of Mr. Justice Kellogg, that the referee properly allowed this item. I dissent from this view for the following reasons: Under the uniform system of accounts prescribed by the Public Service Commission the relator is required to amortize said debt expense in yearly installments. While such expense so amortized is payable out of income, it is not an operating expense. It is an expense due to the fact that stockholders authorize the company to borrow instead of advancing more capital. In computing under the net earnings rule a full return is allowed on the present value of the property bought with the capital so borrowed. The debt expense should be borne by the stockholders out of the net earnings and they are not deductions that should be considered for the purpose of arriving at net earnings. Such expense has nothing to do with the operation of the plant. I think the referee erred in including this item as one of the operating expenses but the opinion of the court is to the contrary.

The referee allowed the amount claimed by the relator for depreciation of tangible property. The courts have recognized that despite ordinary repairs and maintenance physical property will in the course of time wear out and that there must be set aside annually out of gross receipts an amount in addition to ordinary

**50** People ex rel. Cent. H. G. & E. Co. v. State Tax Comm.

Third Department, September, 1926. [Vol. 218]

repairs and maintenance, sufficient to replace such property at the end of its useful life. An allowance for this purpose should be made out of the gross earnings in order to ascertain the true earning capacity. (*People ex rel. Jamaica Water Supply Co.* v. *Tax Commissioners*, 196 N. Y. 39, 57.) The Court of Appeals has laid down the rule that in applying the net earnings rule to the valuation of a special franchise such allowance for depreciation should be made on the basis of what is known as the " straight line method." " The annual allowance for depreciation should be computed by dividing the values of the various kinds of tangible property by the number of years of their respective estimated physical lives and that will be the opinion of the court." (*People ex rel. Manhattan Railway Co.* v. *Woodbury*, 203 N. Y. 231, 236.) In accordance with the above rule the relator determined the annual percentage of depreciation based upon the estimated life of each class of tangible property and applied that percentage to the cost to reproduce new such class of property. The amount set aside by the relator for wear, tear, obsolescence and inadequacy as shown by its books of account and reports for the year in question was a much smaller sum than that produced by the so-called straight line method allowed by the referee for depreciation. The respondent contends that the amount actually set aside by the relator upon its books should be used to represent depreciation and obsolescence. We think the referee was correct in applying the rule as laid down by the Court of Appeals. The relator claims, and it is not disputed, that the amount reserved on its books was based upon percentages of gross receipts less repairs. To adopt such figures would be to adopt a rule which is not the equivalent of the rule laid down by the Court of Appeals. The amount of property retired in any year has no just relation to the amount of depreciation of the entire property of a corporation. The property retired may be much smaller in one year and during other years much larger than the annual depreciation for those years. The retirements in any year depend upon the number of pieces of property which have happened to reach the expiration of their physical lives during that year. The reserve contemplated by the straight line method must be sufficient to take care of all retirements when they occur. It is as fair to say that the amount actually set up on the relator's books for depreciation was inadequate as to urge that it was not proof of the inaccuracy of the depreciation allowed by the referee under the straight line method. The mere fact that in 1922, a number of years later, the relator transferred a substantial sum from its depreciation account to a so-called " contingency reserve " is equally inadmissible to show the adequacy of the depreciation

account in 1915. We conclude that the referee made no error in allowing for depreciation upon the basis of the straight line method.

We also think the referee was correct in allowing the sum of $27,887 for obsolescence in addition to depreciation as claimed by the relator and objected to by the respondent. The objection of the respondent is that this was included in the sum set up on the relator's books for depreciation and obsolescence reserve considered in the last paragraph. The obsolescence claimed by the relator was for two electric generating units which were removed from the plant during the year in question on account of their obsolescence which were replaced by more modern type of machinery. The amount allowed for this loss was the value of the unexpired physical life of these units. This element was not covered by the item of depreciation which contemplates the use of property to the end of its physical life. " This species of property should be left to be considered when such depreciation actually occurs." (*People ex rel. Manhattan Railway Co.* v. *Woodbury,* 203 N. Y. 231, 240.) Our interpretation of the rule as laid down by the Court of Appeals in that case is that such depreciation actually occurs when the property is removed from service. These two electric generating units were removed from the plant during the year in question.

Both parties apparently agree to some other items of operating expenses included by the referee, such as taxes and other miscellaneous deductions from income.

(3) Return on present value of tangible property. The referee has found without exception " that on June 30th, 1915, six per cent per annum was a reasonable return on money invested in tangible physical property employed by a public utility company, and is the rate of return adopted by the parties to these proceedings." The findings of the referee as to the present value of relator's property in the streets and out of the streets and general equipment are agreed to by both parties. The differences between the parties under this heading arise with reference to allowance for working capital, prepayments of insurance, unamortized debt expense and paving costs.

The referee has allowed as a part of working capital as contended for by the relator an item of $50,000, representing average bank balance, and an item of $44,552 for materials and supplies on hand. The referee has also allowed as a part of the working capital the sum of $79,727 as an operating allowance, representing two months' average expenses of the relator. The relator contends that it has to finance its operations for a two-month period, which is the average period which it has to wait for its collections from its

**52** People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926. [Vol. 218

customers. The relator contends that the referee should have allowed for an operating allowance $144,732, representing two months' average revenues. The respondent contends that a fair allowance to the relator for working capital, including bank balance and materials on hand, should be limited to four months' average operating expenses. For total working capital upon this basis the respondent would allow the sum of $159,453. Any reasonable investment of the relator in bank balance, materials and supplies and in operating expenses awaiting the collection of its revenues from its customers is essential to its operations and there is no good reason why it should not be entitled to a return thereon with the rest of its tangible property. (*People ex rel. Manhattan Railway Co.* v. *Woodbury,* 203 N. Y. 231, 234.) This is best determined by what the company has found to be reasonably necessary to meet its requirements on the average throughout the year. We see no reason to disagree with the findings of the referee with reference to these items of working capital, except that having reached the conclusion that the referee should have included in gross earnings the receipts from merchandise and jobbing, rent of appliances and sales of residuals, we think the relator's investments in such departments should be included either as a part of materials and supplies or as a part of the property of the relator outside of streets. It seems that the referee made such allowance in the other case appealed herewith as a part of materials and supplies on hand, having included the receipts therefrom in the item of gross earnings.

The parties disagree as to the manner in which moneys expended by the relator for repaving streets should be treated. When the relator installed property in paved streets it was obliged, for the purpose of installing such property, to take up the pavement. It was also required, after the installation of such property, to restore or replace the pavement. The relator contends that the moneys expended by it to replace the pavement after the installation of its property in the streets were expenditures as a condition imposed by the municipalities in connection with the granting of franchises to the relator; that moneys so expended were expended or paid in the nature of a tax; that such moneys should be excluded from the value of the tangible property in the streets and a return should be allowed on the money so expended separate and apart and in addition to the return allowed on the value of such tangible property because it does not own the pavements. The respondent contends that the cost of the labor and materials expended in restoring and replacing pavements should be considered as a part of the value of the property in paved streets; that while the pavements did

not become the property of the relator the cost of labor and materials expended in the repaving entered into the necessary original costs of the placement of its property in the streets and should be considered as a part of the cost of reproduction less depreciation in determining the present value of the property in the streets. We think the referee erred in agreeing with the relator's contention. The relator relies upon what was said by the Court of Appeals in *People ex rel. Buffalo & L. E. T. Co.* v. *Tax Commissioners* (209 N. Y. 496, 500). That was a case, however, which involved the requirement that a street railway corporation should construct and maintain the pavement between and near its tracks. In that case the court said: " Having required the corporation thus to contribute to the general public welfare, the Legislature could not have intended to impose a tax upon the tangible property so contributed. The materials which go into the paving are really purchased by the railroad company and turned over to the municipality for the benefit of the community at large. The railroad company derives no special or peculiar benefit from the construction of the pavement; indeed it is a burden rather than a benefit." The relator, however, has not been obliged to construct and maintain the pavement as a street railway company is bound to do. The relator contributed nothing to the public in the way of paving. It did not purchase and turn over to the municipality any paving materials for the benefit of the community at large. It simply replaced the pavement blocks which it had itself removed for its own purposes. It simply restored to the public that which the public had previously bought and paid for. We might even take notice of the fact that pavements thus interfered with and replaced are damaged thereby in some degree. Unless the pavement is perfectly replaced to its previous condition the contribution to the general public welfare is one of detriment rather than advantage. While the pavements are not the tangible property of the relator when so replaced, the cost of replacement is a necessary part of the cost of the tangible property laid in the streets and should be added to the cost of reproduction in determining present value. The referee improperly excluded from the present value of the tangible property money expended in connection with pavements and improperly allowed a return upon all the moneys so expended, rather than the depreciated value of the labor and materials expended in connection with pavements. (*People ex rel. Metropolitan Street Railway Co.* v. *State Tax Commissioners,* 159 App. Div. 136, 147; *People ex rel. Niagara Falls Hydraulic Power & Manufacturing Co.* v. *Tax Commissioners,* 202 N. Y. 426, 429; *People ex rel. Kings County Lighting Co.* v. *Willcox,* 156 App. Div.

**54** People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926. [Vol. 218

603, 610; *People ex rel. Manhattan Railway Co.* v. *Woodbury*, 203 N. Y. 231, 234.)

The relator asks a return upon the amount of prepayments of insurance and taxes which relator made during the year ended June 30, 1915, amounting to $2,995. Ordinarily a return upon such prepayments is properly allowed but in view of the fact that the referee made liberal provision for working capital and that at the end of the year relator does not deduct accounts unpaid to it, amounting to much more than the amount of these prepayments, we cannot say that the relator was prejudiced by the failure of the referee to allow any return on such prepayments.

I think the referee properly disallowed the relator's claim to a return on the amount of its unamortized debt expense. Unamortized debt expense represents the unamortized portion of the expense such as printing, commissions, lawyers' fees and like expenses which the company incurred in marketing its bonds. My reasons have been set forth in my treatment of the amortized portion of the debt expense in which I expressed the opinion that the same was not properly allowable as an operating expense. The court does not, however, agree with my views on this point and the opinion of the court is that expressed by Mr. Justice Kellogg.

(4) Earnings attributable to the special franchise. Having ascertained the entire net earnings by deducting the operating expenses from the gross earnings and having deducted from such entire net earnings a fair and reasonable return on that portion of the capital of the corporation which is invested in tangible property, the Court of Appeals says: " The resulting balance gives the earnings attributable to the special franchise. If this balance be capitalized at a fair rate we have the value of the special franchise." (*People ex rel. Jamaica Water Supply Co.* v. *Tax Commissioners*, 196 N. Y. 56.) In accordance with the rule so laid down by the Court of Appeals the referee attributed this entire balance of net earnings to the special franchise and capitalized such balance in accordance with the net earnings rule to find the value of said special franchise. The relator contends, however, that where such an intangible value results from operations partly with and partly without the use of the streets such value is attributable only partly to the exercise of the special franchise. Relator thus asks to apportion this final net income in the proportion which the value of the transmission and distribution property in streets, highways and public places bears to the value of all transmission and distribution property in each tax district. In other words, the contention of the relator is that this intangible value would represent the value of the special franchise alone if the operations

of the company were conducted entirely by the use of streets, highways and public places, but where, as in the case of the relator, extensive parts of the system serving profitable customers are located in large part on private rights of way, and of the total tangible property of the relator a large percentage is located on private right of way, the operating value of the company is derived both with and without the use of streets, and such operating value is only partially attributable to the exercise of the special franchise. Upon this question it is the holding of the court, as expressed in the opinion of Mr. Justice KELLOGG, that the referee erred in refusing to apportion this final net income in the manner urged by the relator. I dissent. I think the referee was right and that the entire balance of net earnings, after deducting a fair and reasonable return on the present fair value of the relator's tangible property, was attributable to the special franchise under the net earnings rule as laid down by the Court of Appeals. The relator having sought to prove an over-assessment pursuant to the net earnings rule must yield to its requirements. The fair intendment of that rule was to first eliminate a full and fair return to the relator upon the fair value of all of its other properties outside of the value of its special franchise. The value of its other property is measured by what it will cost to reproduce that property less depreciation. Relator's tangible properties outside of streets cannot be worth more than their cost of reproduction, except as they may be enhanced in value by being portions of a system which has been made more valuable by reason of the granting of a special franchise. The granting of a special franchise tends to create a monopoly and to destroy competition. The relator having been allowed a fair and reasonable return on its tangible property, including the value of its private rights of way and plants located on private property, measured by the cost of reproduction method, it cannot remeasure that value of its property by what it earns. Unless a fair rate of return on the fair value of relator's tangible property has not been allowed, the final figure must relate to the return on the intangible value of the specific franchise. The important consideration, therefore, is whether a fair rate of return has been allowed on the fair value of relator's tangible property. Since both parties have agreed to the rate of return allowed and to the values attributed to property in streets and property outside of streets, I think we must assume that the relator has not been aggrieved. The portion of the intangible or operating value of the relator's property located outside of streets, highways or public places is included in the return allowed on its tangible property and deducted from entire net earnings before reaching the balance

56    People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926.                    [Vol. 218

attributable to the special franchise.    I, therefore, dissent from the contrary view of the court as to this item.

(5) Town of Fishkill assessment.    The relator claims that it carried on no operations in this town and that no intangible value should be attributed to its special franchise in that tax district. The respondent makes no reply to this contention.    On the trial the relator showed that it owned a cable across the Hudson at Storm King, half of it laid in the town of Fishkill; that the cable which was assessed as tangible property, having a present value of $500, was the only property which the relator owned in the town of Fishkill; that this cable was not and never had been used by the relator for the purpose of its operations; that it had been placed in the river by the board of water supply, from which it was bought by the relator, with the intention of taking it up.    The relator did not operate in the streets, highways or public places in the town of Fishkill and in fact had no franchise to so operate from the town.    The operations from which $3,864 of earnings attributed to said town were derived were in fact received from the sale of power to the Southern Dutchess Gas and Electric Company.    This power was metered by the relator at its Newburgh station and delivered to the Southern Dutchess Company in the middle of the Hudson river, which was the line separating the town of Fishkill from the city of Newburgh.    The power was transmitted from Newburgh to Fishkill by means of a cable which had been installed by the relator and the Southern Dutchess Company.    The portion of that cable lying in the city of Newburgh belonged to the relator. The portion lying in the town of Fishkill belonged to the Southern Dutchess Company.    Consequently earnings of $3,864 were not derived from any operations of the relator in the streets, highways or public places in thetown of Fishkill nor by the use of any property in that town which belonged to the relator.    No intangible value due to those earnings could be assessed against the relator in that town.    The full valuation of the relator's special franchise in that town must be limited to $500, representing the present value of its unused cable lying in that town, and the referee's decision should be modified accordingly.

(6) Equalization.    We agree with the referee in finding that the revised full valuations should be equalized at the rates determined by the State Tax Commission.    The respondent contends that there was no evidence submitted by the relator to show that any property upon any of the assessment rolls under review had been assessed at less than full value; that, therefore, it does not appear that there was any inequality of assessments to the detriment of the relator; and that under such circumstances the relator is not

People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.   **57**

App. Div. 44]          Third Department, September, 1926.

entitled to have its property assessed at less than full value.   We do not see how the respondent has any basis for such a contention. The relator did not properly tender the issue of inequality and did not attempt to prove that its assessments were unequal for the reason that they had been made at a higher proportionate valuation than the assessment of other real estate in the respective tax districts or any of them.   The relator simply adopted the rates of equalization which had been determined upon by the Tax Commission itself in the making of the assessments in question. If the relator did not properly tender the issue of inequality, it did not thereby lose its right to adopt the Commission's own rates of equalization.   It lost only its right to question those rates.   It was the duty of the Commission under the statute (Tax Law, §§ 45, 45-a, 45-b, as added by Laws of 1916, chap. 334)* to determine rates of equalization and its rates so established, after opportunity for all parties to complain, should be binding, except when those rates are attacked in some appropriate manner allowed by law.   The relator did not appropriately attack them in its petitions in these certiorari proceedings and the respondent objected to going into that phase of the assessment on that very ground.   It would be strange indeed if the respondent could stand on both objections, namely, that the rates adopted by the Commission could neither be attacked nor adopted.   The respondent even stipulated the correctness of all of these rates, except for the city of Newburgh, and no proof was adduced by the respondent to rebut the Newburgh rate as determined by the Tax Commission.

(7) Proof of over-assessment under net earnings rule.   The respondent complains that for the purpose of showing that it was over-assessed the relator has confined itself to the use of but one rule or method (the net earnings rule) which might have been lawfully adopted or used by the assessing officers in the first instance.   No proof, however, has been called to our attention, nor has any suggestion been made, that this is a case where any other rule or method of assessment might have been adopted or that this is a case of a corporation enjoying a special franchise which, by reason of mismanagement or other cause, has yielded no earnings which may be capitalized into a special franchise tax assessment under the ordinary net earnings rule.   The respondent adopted the net earnings rule in making its assessment.   The referee has found " that these special proceedings have been tried by all the parties hereto upon the theory that the method for ascertaining the true value of relator's special franchise   *   *   *   was what

* See Laws of 1920, chap. 648, and Laws of 1921, chap. 124, since amdg. Tax Law, § 45-a.— [Rep.

**58** People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926. [Vol. 218

is known as the net earnings rule." The Court of Appeals has said that in ordinary cases the net earnings rule is " the best practical method that the taxing officers and the courts have as yet been able to evolve." (*People ex rel. Hudson & Manhattan R. R. Co.* v. *Tax Comrs.*, 203 N. Y. 119, 131.) Since there are no unusual circumstances which would tend to make the net earnings rule an improper basis of value and since the parties proceeded upon the theory that such rule was the proper method of assessment in this case, the burden rests upon the relator to show " that a proper system has been erroneously applied." (*People ex rel. New York Central & Hudson River R. R. Co.* v. *Priest*, 150 App. Div. 24.)

(8) There is also presented upon this appeal and argued at the same time an appeal from an order of the Special Term granting to the relator an additional allowance of costs of $480. The only reason assigned by the respondent for appeal from this order is that the respondent claims that the relator has failed to make out a case for any relief from the assessments as made by the Commission. Section 1513 of the Civil Practice Act specially refers to proceedings to review an assessment and gave to the court the discretion to make such an additional allowance for costs. The discretion was properly exercised, but in view of the fact that the orders based upon the report of the referee must be reversed and the proceedings remitted to the Special Term for further disposition in accordance with the opinions herein, the order granting an additional allowance must likewise be reversed.

The orders appealed from should be reversed, without costs to either party, and the proceedings remitted to the Special Term for further hearing and disposition in accordance with the opinions herein.

H. T. Kellogg, J. It seems to me that Mr. Justice Hinman takes too literally and applies too strictly the statement of the so-called " net earnings rule " made by Judge Bartlett in *People ex rel. Jamaica Water Supply Co.* v. *Tax Commissioners* (196 N. Y. 39). The " rule," so called, is a creation, not of the Legislature, but of the courts. In several decided cases it has been found to express the appropriate method of valuing the special franchises involved. However, the method did not become, and could not have been made, through judicial sanction alone, a " rule " of franchise valuation universally applicable. It may in a given case be wholly inappropriate; it may be wholly appropriate, or it may be appropriate only in a modified form. The " rule " has not the rigidity of a statute but is susceptible of being moulded by the courts which declared it to fit the logical requirements of any given case. Judge Bartlett himself, in the *Jamaica* case, says:

" In our opinion it is beyond the province of the courts to lay down an exclusive rule of franchise valuation applicable to all cases." Again, he states: " It is conceded, however, that there are many reasonable methods, and it is not for the courts to insist that one shall be pursued rather than another so long as the Legislature has chosen to leave them all equally open to the assessing officers." In the *Jamaica* case the business of the relator was to deliver water to customers. As the water was carried exclusively in conduits laid in public streets the franchise so to carry it was productive of a large part of relator's income. Therefore, when from net income generally there was deducted a reasonable sum to represent a return upon tangible property owned, a capitalization of the remaining sum fairly represented the value of the intangible right to use the streets. In our case we have a wholly different situation. The relator's business is to deliver electric current to the buildings of its customers situate at divers places in three different counties. It is carried upon wires strung over private rights of way owned by relator as well as over public streets and public waters. The distance which it is carried over private far exceeds the distance which it is carried over public ways. Every foot of carrying wire is as essential to relator's business as every other foot. Yet all the value of relator's intangible right to carry current is attributed by Mr. Justice HINMAN to the right of carrying the same over public ways. It would seem that Mr. Justice HINMAN misapprehends the nature of the special franchise enjoyed. He says: " The granting of a special franchise tends to create a monopoly and to destroy competition." He seems to think that the relator is being taxed for the right of doing business, and an exclusive business. The tax to be imposed is in no sense a tax upon the relator's corporate franchise to do an electric business. It is merely a tax upon a property right — the right to cross a street. The right so to cross is no more valuable than the right to cross land privately owned. The public character of the right certainly gives it no added value. It is argued that since from general net income there has been deducted a reasonable return upon all tangible property, including relator's private rights of way, the income remaining must be attributed to the remaining property, viz., the public rights of way. The fault in the argument lies in the fact that in estimating the value of the private rights of way only the cost or reproductive value of the easement, the poles, the wires and other tangibles has been considered. No value is accorded to the relator's right to carry current upon the wires over such *private* rights of way. Yet, in estimating the value of the relator's special franchise the

60   People ex rel. Cent. H. G. & E. Co. *v.* State Tax Comm.

Third Department, September, 1926.        [Vol. 218]

chief item considered is the value of the relator's right to carry current over *public* ways. It is unfair and productive of an inaccurate result to employ differing measures of value in the two instances. Therefore, the argument logically fails. It seems to me that the special franchises of the relator should not be valued at a greater sum than such proportion of the capitalized net earnings attributable to wires carrying current in a given town as the length of the wires over public ways bears to the total length of all such wires in such town. Again, it seems to me that Mr. Justice Hinman has applied the definition given by Judge Bartlett too literally in reference to " amortization of debt, discount and expense " and " unamortized debt expense." Because Judge Bartlett said, " Ascertain the gross earnings. Deduct the operating expenses," and these charges are not strictly " operating expenses," Judge Hinman declines to deduct them. Judge Bartlett undoubtedly meant that net earnings should be ascertained. These items clearly enter into the problem of determining net income. They should be deducted. Otherwise I agree with the conclusions reached by Mr. Justice Hinman.

All concur, except Hinman, J., who dissents as to the opinion of H. T. Kellogg, J.

Final orders reversed on the law and facts, without costs to either party, and proceedings remitted to the Special Term for further hearing and disposition in accordance with the opinions. Order granting relator an additional allowance of costs reversed on the law, without costs, and motion denied, without costs. The court disapproves the following findings of fact: 21, 25, 28, 31, 33, 34, 37 and 39.